## DUFFIN v. LUCAS.
### No. 5713.

Circuit Court of Appeals, Sixth Circuit.
Jan. 13, 1932.

DENISON, Circuit Judge, dissenting in part.

Elwood Hamilton, of Louisville, Ky. (J. C. W. Beckham, Jr., and Woodward, Hamilton & Hobson, all of Louisville, Ky., on the brief), for appellant.

Ottamar Hamele, of Washington, D. C. (Thos. J. Sparks and Frank A. Ropke, both of Louisville, Ky., and C. M. Charest, of Washington, D. C., on the brief), for appellee.

Before DENISON, MOORMAN, and HICKENLOOPER, Circuit Judges.

PER CURIAM.[1]

This suit was brought by appellant-taxpayer against the collector of internal reve-

nue, to recover payments of income taxes and penalties, which he claimed had been erroneously assessed. A jury was waived, and the court made extensive special findings upon the numerous issues. The case involves items for five separate years—1919, 1920, 1921, 1922, 1924. It can best be considered by taking up the years separately.

■ There is one preliminary question. Upon the second day of the trial, appellant tendered an amended petition, asking repayment as to two or three additional items of erroneous assessments. Leave to file the amended petition was refused on the sole ground that the claim for refund filed with the commissioner did not cover these items. Kings County Sav. Inst. v. Blair, 116 U. S. 200, 6 S. Ct. 353, 29 L. Ed. 657; Rock Island Co. v. United States, 254 U. S. 141, 41 S. Ct. 55, 65 L. Ed. 188. We agree that the refund claim, which had been filed in this matter, did not, as to these new items, sufficiently satisfy the rule. It said: "See Protest [identified]. The Commissioner, in adjusting the liability of the taxpayer, included in the taxable income [certain specified items, other than those presented by the amended petition], all of which was erroneous and was not taxable income. The Commissioner erroneously assessed $13,316.47 for making a fraudulent return." The protest, thus referred to, elaborated the complaint as to the certain items specified in the refund claim, and also made some reference to the items of the amended petition; but taking the refund claim all together, we think it was not intended to and should not be construed to go beyond the specified items.

The alleged waiver of the defendant's right to maintain this objection to the amended petition does not sufficiently appear. When the petition was tendered, objection was made on this ground, the court reserved his ruling, and proofs were taken and argument made, covering also the new items; but this course, being necessary because the ruling had been reserved, did not amount to a waiver of the objection. Hence, the refusal of leave to file the amended petition was right.

Coming to the issues properly made: The first item involved is the profit received by the taxpayer in 1919 from the promotion of the Belle Point Oil Company and the sale of its stock. He was associated in this promotion equally with Bulleit and Gwyn. Their respective taxable incomes in the same transaction were considered by the Board in Re Bulleit, 3 B. T. A. 631, and by this court in

---

[1] Throughout this opinion, we use round sums, instead of exact amounts. Our figures are sufficient to identify the items; and they are intended to have only that effect.

Lincoln Bank, Gwyn's Executor, v. Commissioner, 51 F.(2d) 78; though the proofs in those cases are not incorporated in the present record. The syndicate, consisting of these three promoters, carried on its operations in the name of Bulleit, and the participation of the other two was not publicly known. They made a contract to buy the oil properties of the Hopewell Company and they agreed to pay the Hopewell stockholders therefor (omitting an item now immaterial) $200,000 in cash and 200,000 shares of the capital stock of the new corporation to be organized, to be considered as at the rate of 50 cents per share. It was a part of the understanding that the new company was to have a capital stock of 1,000,000 shares, of which 100,000 should be sold for cash at par, $1, and 900,000 should belong to the syndicate (Bulleit) in exchange for the Hopewell properties, and that the syndicate (Bulleit) should deliver 200,000 shares to the Hopewell stockholders, sell 100,000 for cash at par, and out of the proceeds of the sale of the other 700,000, pay the Hopewell stockholders $200,000. Plainly, if the 100,000 could be sold at par and 400,000 at the stipulated price of 50 cents, the promoters would have as their profit 300,000 shares, and/or the proceeds of whatever part of the 300,000 they might sell. By the plan of organization and sale adopted, the $100,000 of par stock was apportioned to the sales of the 50-cent stock in such a way that the average price subscribed and paid for the stock sold was 56 cents per share. The syndicate procured subscribers to this stock so that a large number of persons subscribed and paid a total of $200,000 for 400,000 shares, as well as paying par for their percentage of the par stock. The syndicate was thus in funds to pay and did pay this $200,000 to the Hopewell stockholders. They also seem to have sold about one-half of their promotion stock. Each of them had subscribed for 100,000 shares of the 50-cent stock, with the proportionate par stock. They thus appeared to the other subscribers to be joining in the purchase of the property upon the same terms offered to every one. It is clear enough that their interest as vendors was concealed. They admit that if it had been known that they were selling instead of buying stock, the plan would have failed.

It is quite impossible to tell from this record, with any certainty and accuracy, to what extent the syndicate unloaded its own profit stock in this transaction so as to realize taxable income. The District Court found that the syndicate received by the sale of its stock $147,000, of which Duffin's share was $49,000; that this was his gross profit, from which certain expenses should be deducted, leaving a net profit of about $41,000; and as the commissioner had assessed and Duffin had paid the tax upon a basis of about $34,000 profit, he could not recover in this suit. We think this finding cannot stand. It is based wholly upon the testimony of Bulleit, who managed the syndicate's operations; and while he says that he paid Duffin $49,000 as one-third of the price of the stock sold, for which the syndicate received $147,000, in the same sentence he says that the syndicate paid into the company $149,000 as its subscription upon the sale of this stock, and that the money which they received and divided was practically the same money which they had just contributed and paid in. What happened plainly was that, from time to time, they paid in the installments upon their nominal subscriptions, and being in entire control of the company's treasury, they paid the money back (through Bulleit) to themselves upon the theory that it was their stock which had been paid for and that they were entitled to the proceeds. These dealings were all one transaction; largely, if not wholly, the various amounts which Duffin paid in on different days were balanced by the same amounts paid back to him at about the same time. In so far as this situation, most of which is undisputed, is recognized in the opinion and findings of fact, it is then disregarded, upon the theory that the money received was received by the syndicate or partnership, while the subscriptions were made and paid in by individuals. We do not see how any such distinction is applicable. The subscriptions were part of the syndicate transactions. They were not made with the purpose or intent of investing the money subscribed, but only to make a market for the stock and lead others to subscribe and buy, who would do so on reliance on the standing and reputation of the syndicate members. This motive would be important, and this conduct condemnatory, from obvious points of attack; but the question here is not what their motives were or how they injured other people, but what profits they made. In this transaction, as so far considered, there is nothing but taking money out of one pocket and returning it to the other. It did not involve any taxable income.

The ground upon which the District Court sustained the assessment being thus in our view untenable, was the judgment there-

fore prejudicially erroneous? We think not. In such a suit and upon such an issue as this, the burden is upon the plaintiff to show that he did not owe the money which he paid and which he seeks to get back. The suit is and is equitable in character; if the finding like an action for money had and received, by the commissioner that a particular receipt was income appears to have been right for any reason, plaintiff must fail. New York Life Ins. Co. v. Anderson (D. C.) 257 F. 576, reversed on another point (C. C. A.) 263 F. 527; Champ Spring Co. v. U. S. (C. C. A. 8) 47 F.(2d) 1, and cases cited.

The commissioner fixed this item of profit at about $34,000. He reached this result upon a theory and upon a computation which we cannot ascertain from the record; but, regardless of that theory, the question is whether the facts justify that figure. It appears that during 1919 the syndicate initially received about 300,000 shares which represented its promotion profit. All the investments which it had made had been returned to it except $2,000 ($149,000 less $147,000), leaving this sum as then the net cost of this stock. Later, and in order to prevent litigation, the syndicate paid to a dissatisfied Hopewell stockholder about $23,000; but it cannot count this as an expense attending the original profit stock, because at the same time and for this price it bought from him 16,678 additional shares. The syndicate confessedly sold as much as 177,000 shares of its own stock, and at the 50-cent selling price, 50,000 shares sold would reimburse the syndicate for this total $25,000 investment, leaving about 267,000 shares as its net profit. One-third of this profit belonged to Duffin; and when the syndicate was wound up, as of July 31, Duffin received into his absolute control as his profit about 89,000 shares, less what he had sold or had been sold for him. It is quite impossible to determine from this record how much he had sold or at what price. It is not necessary to do so, if he must treat as profit the whole 89,000 shares, at a valuation totalling more than $34,000.

We have then the questions whether, prior to July 31, there was a market value of as much as 50 cents for this stock; and, if so, then whether it was taxable income as of that date.

■ It seems beyond dispute, upon Duffin's own proofs and contentions, that this stock then had a market value of about 50 cents. As early as April, the syndicate began to put this stock upon the market at 56 cents. True, the dealings were in the form of subscriptions to or rights in a stock not at that time issued, and that advance subscriptions do not prove a later market value; but, in this way and during the next two or three months, the syndicate floated, or in Duffin's own words in his protest on file "sold," 577,000 shares at 50 (really 56) cents per share. This evidently does not include the wash sales to or subscriptions by the syndicate, but it does include 177,000 shares which the syndicate had once subscribed for and then transferred to others, whether as "shares" or as "rights," or however informally. Such a great variety of transactions, extending over a substantial period and involving a large number of persons, gives them dominant character as sales rather than as mere subscriptions. Indeed, after Duffin, in his protest, represented them as sales, and fixed the sale price of the stock at 50 cents, for the purpose of having that price used as the basis of an assessment of profits against him, he cannot complain if the commissioner then, or the court later, takes him at his word. In his briefs in this court he admits that he had "sold" about 35,000 shares for about $20,000; there is no claim of any sale for less than the 56-cent price fixed. True, Duffin and Bulleit, as witnesses in this case, make this market value 25 cents; but not only is there no support upon which to base their estimate, but also they were apparently considering the value when they first became entitled to this stock, rather than much later after the value had been established by the successful flotation.

■ The income might have been otherwise (perhaps more accurately) shown by assigning a cost value to each share of the stock and ascertaining the profit upon each share sold, rather than by treating the matter as a unit and giving credit for the entire cost before observing any profit. However, in this case as in the Gwyn Case, all parties have adopted this unit view, and, for that reason, we accept it.

■ On July 31, the Belle Point Company merged with the Old Dominion Company, and the stockholders of the former exchanged their shares for shares of the latter. Therefore, Duffin insists that even an established value for the former does not make any measure of taxable income, because the exchange of Belle Point stock and nothing else for Old Dominion stock and nothing else, did not make a taxable transaction, and there would be no taxable income until the Old Dominion stock was sold. As a general proposition, applicable in generally similar situations, this is not to be

doubted; but in the nature and the closing of this syndicate deal, we find sufficient reason for exception to the general rule. True, for most purposes, such a syndicate or joint adventure is a partnership, and the profits of the individual partners are received when the syndicate receives them; but we held in the Gwyn Case that there was no taxable profit when the syndicate received this stock; and many times profits will not be beyond jeopardy until they are distributed to the syndicate members. There is no question here as to the propriety of taxing the cash profits which had been distributed. The winding up of the syndicate and the distribution to its members of the profit stock was a distribution and a receipt of profits. It marks a rest in the transaction, appropriate to make a basis for income computation. If the stock had all continued to be carried in Bulleit's name as a continuation of the syndicate enterprise, subject to risk and loss in future dealings, there would be a different question; but it was distributed among the individuals, free from all further control and at their personal disposition. It may fairly be said in this case that the receipt of the stock by the syndicate was only a contingent or constructive receipt for the members or partners, and that the complete and actual receipt by them occurred on the winding up. If it then had a market value, we see no sufficient reason for not considering that transaction closed.

■ Upon this record, the proofs imperatively require a finding that Duffin realized more than $34,000 profit in this Belle Point transaction. Hence, he suffered no prejudice by the judgment on this point.

The next item involved for 1919 is the income on account of Duffin's contribution to purchase leases for the Old Dominion Company. On this account the commissioner determined an income of about $23,000 and the court approved a tax accordingly. This is the same transaction discussed by us in our opinion in Board v. Commissioner, 51 F.(2d) 73; and, in accordance with that opinion, we hold that this item was wrongfully assessed against the present taxpayer.

■ The next involves an item of about $16,500, found by the commissioner to be a dividend received by the taxpayer in 1919, upon his stock in the Curd-Blakemore Company. At the trial below the defendant conceded partial error and there remains in controversy about $10,000 of this item. As the result of this Curd-Blakemore transaction, Duffin included in his 1919 reported income $10,000 as an attorney fee. The commissioner, by successive actions, increased this attorney fee and added a large stock profit, then reduced the attorney fee and the stock profit, and eventually cut out both and substituted a dividend charge. The final assessment was for a dividend and that only, and the tax must be first tested by the question —dividend or not? The commissioner and the defendant in this case have abandoned all other theories of taxability. The District Judge, having indicated some doubt as to the dividend theory, suggested that it made no substantial difference whether Duffin was taxed upon this as for a dividend in 1919, or as for a stock profit in 1920; but even if in a suit against the collector, as this is, based upon separate causes of action for separate years, we could balance a wrong one year against a right in another, we observe that here the rate in the two years is materially different. The plaintiff is entitled to have a decision as to the existence of taxable income in each year.

■ On May 31, 1919, Curd and Duffin owned $100,000 par value of stock in this company, practically one-half each. They had recently purchased it from the bank, the former owner, and had paid for it by canceling certain indebtedness in their favor against the bank, and by giving the bank their note for (say) $90,000. For the purpose of this case, the obligation may be treated as several—$45,000 each. On the last day named, they caused the corporation, out of its assets, to pay this note. This was plainly $45,000 received by Duffin, though it never came to his hands directly. In so far as it was paid out of the company's surplus, it was analogous to and more or less equivalent to a regular earned and declared dividend and therefore taxable as such; in so far as it was paid out of capital, it was analogous to a liquidating dividend, and taxable or not, as it might involve a profit on the stock. According to the corporate books on that date, the surplus or undivided profit was $33,000. The company had made large profits for each of the two fiscal years then ending, but the federal income tax had not been set up on the books as a liability, and, even though the unentered tax was only for the one year then ended, it was clear that it would be a substantial amount and would accordingly diminish the then imperfect surplus entry. The subsequent history was that in August, 1919, the company paid $13,000 as and for its past-due income tax. The District Court held that this sum of $13,000

was properly deductible from surplus as of the preceding May, leaving a surplus of approximately $20,000. Accordingly Duffin was charged with the receipt in 1919 of $10,000 as a dividend. During the next year the commissioner made a deficiency assessment for the year 1918 of $20,000. While this tax might thus be considered as having accrued and been owing on May 31, 1919, and as thus consuming the entire remaining surplus as of that date, the necessity for assessment of taxes on the basis of annual accounting periods (Burnet v. Sanford & Brooks Co., 282 U. S. 359, 51 S. Ct. 150, 75 L. Ed. 383) prevents giving this effect to the 1920 deficiency assessment. According to the books of the company there was a surplus or undivided profit of $33,000 at the time the company discharged Duffin's $45,000 indebtedness to the bank. At that time, therefore, one-half of such sum might well have been regarded as payment of a dividend. Clearly this would have been so had a dividend been specifically, instead of inferentially, declared; and while it may have been proper enough to reduce this book surplus by the $13,000 paid in August, 1919, upon the hypothesis that this was then a known indebtedness which had not been entered upon the books, the deficiency assessment of the succeeding year was not a liquidated debt on May 31, 1919, and assessment of the taxpayer as upon receipt of a dividend of $10,000 as of that date is quite as favorable to him as he could reasonably demand.

This is all the more evident, if we consider the effect of the entire transaction. As part of the purchase price of the stock Duffin had canceled a claim for an attorney fee of $25,000. There was no claim that this was not worth its face when canceled. The situation was therefore in all respects equivalent to a receipt by the taxpayer of $25,000 as an attorney fee and a payment of this sum to the bank as part satisfaction of purchase price indebtedness. As we have already held, therefore, in connection with the Belle Point Oil Company transaction, this showing foreclosed the creation of any equity of recovery on the part of plaintiff.

Coming to the year 1920: The first item relates to the so-called pipe-line profits, being one of the matters covered by our opinion in Board v. Commissioner, supra. On the authority of that case, this part of the judgment, now here, is affirmed.

The next item relates to a profit made by Duffin upon the sale of his stock in the Curd-Blakemore Company. The purchase price note, which Duffin had given in 1919, had been paid out of the property, as above recited, and hence Duffin's stock had cost him nothing excepting his canceled attorney fee. Upon the question of the profit made when the stock was sold in 1920, it would seem that the $25,000 must be treated as part of the 1919 cost to Duffin, no matter whether he made a good or a bad bargain when he canceled the claim and took the stock. The 1920 sale was an exchange for other stocks, bonds, and property. Upon these items so received, the commissioner fixed a value of $39,000. From this he deducted (though the theory of deduction is not very clear) the $16,000 which he had charged against Duffin as a dividend in 1919, making the 1920 income $23,000. The trial judge fixed the market value of these items as $26,000, and, deducting the $10,000 which he had allowed as the previous year's dividend, fixed the taxable income on this sale as $16,000. No account whatever was taken of the $25,000 cost. According to the findings of the trial judge, therefore, we would have a cost of $25,000 and a sale for $26,000; but the court did not take into account the other apparently necessary deductions. When Duffin and Curd sold, they agreed to pay all obligations of the company. There was an outstanding controversy about a claim, which was finally compromised and settled for $3,000. Duffin was obligated to and did pay one-half. In addition, there was an income tax claim, the amount of which was then unsettled, but which Duffin and Curd specifically agreed to pay. It was afterwards, and before this 1920 return, fixed at (balance unpaid) $20,000. Duffin was apparently liable for all of this, but at least liable for one-half. It therefore cannot be said that these assets had any value to Duffin beyond his $25,000 unreturned capital investment; and there was in this item no basis for a profit tax. However, for some reason not now clear, Duffin, in his claim of refund as to this item, complained because the commissioner had "included in taxable income * * * $9,667.69, profit on the sale of the Curd-Blakemore stock." This is, in effect, a concession that there was no error in the action of the commissioner as to the remainder of the amount which he included on account of this profit; the total having been $23,000. The trial judge fixed the taxable income on this sale as $16,000, and gave Duffin a judgment based upon this diminution of $7,000. If the limitation in the refund claim were now to be enforced against Duffin, the error in the judgment below which

results from our conclusions stated would be that based on the difference in income between this $7,000 and the $9,667.69 which Duffin complained about; but this limitation was waived by the collector, as it might be. Tucker v. Alexander, 275 U. S. 228, 48 S. Ct. 45, 72 L. Ed. 253; United States v. Felt & Tarrant Co., 283 U. S. 269, 272, 51 S. Ct. 376, 75 L. Ed. 1025. In Duffin's petition, relating to this item, he sets out that the value of these assets was $27,169, but that the commissioner had assessed it as $39,838, and thus Duffin states an overassessment of $12,669. Apparently he includes this $12,669 in his allegation that the taxes based thereon were illegal. He then states that he filed a refund claim for "taxes, interest and penalties herein stated to have been illegally paid." The answer of the defendant admits the due filing of this refund claim for "taxes, interest and penalties herein [in the petition] stated to have been illegally paid." Upon our view of the facts to the effect that there was no income from this transaction in 1920, Duffin was entitled to have his net income as fixed by the commissioner abated in this matter to the extent of the $12,669 claim. He had abatement in the court below to the extent of $7,000; and upon the present record he was entitled in addition to the difference, reducing the taxable income as to this item to slightly in excess of $10,000.

■ In 1920 Duffin deducted $16,000 for bad debts. The commissioner, with a trifling exception, disallowed this deduction. The District Court affirmed. These debts were actually charged off in 1920. The question is whether they were during that year ascertained to be worthless. During pendency before the bureau, Duffin's counsel filed a detailed memorandum as to these claims, reciting the history of each and giving the reason for charging off in 1920. As a witness on the trial below, Duffin read this paper as if a part of his testimony. In effect, he presents the memorandum as his recollection and understanding of these details. There is nothing in conflict—no cross-examination, no motion to strike out. In this situation, these recitals must be accepted. They show that on March 1, 1913, these accounts were believed to be valid and collectible at their face; and, whether or not this showing was necessary, it thus appears that there was a loss of the full amount, at some later date.

■ The statute (Revenue Act 1918, § 214 (a) (7), 40 Stat. 1067) says "ascertained to be worthless and charged off within the taxable year." There is no grammatical requirement that the clause "within the taxable year" should limit "ascertained" as well as "charged off"; as a matter of precision in language, there is ambiguity; but the necessities of administration, the need of reflecting the income truly for distinct periods and the departmental regulations all justify the double limitation. Hence, we must know when the worthlessness was "ascertained." Clearly, this ascertainment must have been by the taxpayer. Sometimes the processes of the law declare a debt to be worthless. An execution returned unsatisfied, winding up the estate of a deceased debtor with no payment, a discharge in bankruptcy with the closing of the estate and no dividends—in these cases it may well be that the taxpayer must be deemed to have "ascertained" the worthlessness when this legal demonstration occurs; but these cannot be the exclusive means. Worthlessness may exist without these tests, and the taxpayer may know it in other ways but we can see no absolute duty on the taxpayer's part to ascertain worthlessness, at his peril, during this same year when the debt becomes uncollectible by law. We think there must be, in many cases, a reasonable discretion on the part of the taxpayer, even though he knows that he cannot collect by law at that time to treat it as not entirely worthless, relying upon the good faith and good intentions of the debtor and hoping for better results next year. There is difficulty in saying, as the District Judge did, that the mere lapse of time— five years in Kentucky—raises the inference that the account became worthless at the end of the last year of that period. The statute may not have run on account of absence, minority, etc. There may have been a new promise, the statute gives a privilege which may never be claimed, etc. However, there must be some rule; and we think it safe to say that where the statute had run, in 1918 or before, unless there was something which tolled it, the burden was upon the taxpayer to show, either that the statute had not run or that he had substantial reason to think he might nevertheless eventually get part payment.

Applying these views, we find that the proof offered was not sufficient to meet this burden. Accepting as evidence the statement, above described, it failed to show in any instance that the statute had not run as early as 1918, or that Duffin had as late as 1920, any reasonable expectation that these items, or any part of them, would or even might be paid. The disallowance must stand.

For 1921 Duffin contests an item of $8,575, said to have been received by him as fees. The commissioner found that Duffin received during this year $14,000, as fees from the Kentucky Wagon Company. On the trial, Duffin denied receiving anything, his denial being based on the statement that he could find no record of any such receipt, and his statement to this effect was accompanied by proof that the books of the Kentucky Wagon Company showed no such payment. This closed the proof on this subject, except that the court had before it a transcript of Duffin's own ledger account with the wagon company (the only record which Duffin seems to have had approximating this character), and there was also a cash book produced by Duffin as his record of his receipts and disbursements in his law business (obviously very imperfect and incomplete). The judge in his opinion expressed doubt whether this cash book had ever been put in evidence. It would seem that the entries thereon had received no attention until after the proofs were closed, and Duffin was not examined in regard thereto. The so-called ledger account, which was in Duffin's handwriting, taken with his testimony, showed that at the end of 1920 the wagon company, being in financial trouble, wished his services, and he declined unless there was a satisfactory settlement and adjustment as to his past service for several years. Duffin's memorandum, entered under date of December, 1920 (though doubtless it was actually written at an unknown later date), is, we think, plainly intended to be a statement that his claim for services and expenses for the previous five-year period, estimated by him at a larger sum, was adjusted and settled at the sum of $30,000; that the previous payments to him on this account were adjusted and settled at the sum of $14,000, leaving a balance of $16,000; and that this balance was paid in 1922 and later years. We do not overlook the confusion in this credit entry. It says: "Agreed settlement and payment heretofore and to be paid on basis of $30,000, a credit of $14,000." This was plainly intended to speak as of December, 1920, which date precedes it. The dates 1920 and 1921 opposite later lines of the entry are justified as showing that the account was covering the whole period. The words "and to be paid" are an obvious blunder. They cannot sensibly indicate that any part of the $14,000 credit entry in 1920 was to be paid in subsequent years. Upon the basis of this ledger entry, the commissioner

held that the entire $14,000 should be considered as fees received in 1921. This was obviously without justification, and the District Court rejected entirely that view. However, the cash book (if it was in evidence) has a check received from the wagon company, April 8, 1920, $8,000; and April 21, "Check, fee, $575." The District Court concluded these two items should be considered as fees received in 1921. As to the $575, the proofs tend to support the judgment. As to the $8,000 item, we think otherwise. There was a great amount of confusion in his book records, such as they were, of Duffin's transactions; but the wagon company was a large corporation, probably with an elaborate and accurate system of bookkeeping, and that this payment of $8,000 should have been made to Duffin to be applied upon his account without entry on the company's books, is hardly credible.

The cashbook entry had no substantial tendency to show that the payment was for fees. His accounts show charges against the wagon company in that year for large amounts for miscellaneous expenses, and one item of more than $8,000 and one more than $2,000, apparently for advances made by Duffin on some company indebtedness. In the present state of the record, the inference that the check was to make Duffin good for some payment that he had made or was to make on account of the company, is distinctly stronger than the supposition that it was for fees. In the former case, it would have been charged off by the wagon company on its books to an appropriate account and not to Duffin; in the latter case, it would naturally have been charged to him; the latter inference is only surmise. This deficiency in the proof cannot be helped out by any presumption in favor of the commissioner's finding. Duffin's proofs meet that presumption so completely that its function is ended. We see no reason why this presumption is other than procedural nor why it should not be confined to the true effect of such presumptions. See New York Life Ins. Co. v. Ross (C. C. A. 6) 30 F.(2d) 80, 82, 84; Equitable Life v. Sieg (C. C. A. 6, Nov. 10, 1931) 53 F.(2d) 318. When a taxpayer seeks to recover his tax payment, the burden of proof is upon him to show that the assessment was wrong and he did not owe the money; but if, at the end, the clear preponderance of proof is that the taxpayer is right and the commissioner wrong, the initial presumption cannot balance or turn the scale; and upon a review by this court of

the findings of the trial judge, this presumption, thus overcome, cannot serve as substantial evidence to support the trial judge's finding.

Upon this record, the proof is not sufficient to sustain the finding that the $8,000 was income. There must be a retrial of this issue; and it ought not to be difficult to make the result demonstrable rather than wholly uncertain. The status of the $575 is also for retrial. It is a part of the same item. Of course, further evidence, explanatory of the book entries, may give them a different force.

In 1922 two items are contested. Duffin reported as fees from the Kentucky Wagon Company $5,436. The commissioner increased this by the sum of $3,593. The commissioner also charged up, as having been received for fees from the States Oil Company, $10,000. The District Judge increased the $5,436 to $7,500, thus approving $2,064 of the commissioner's increase. He approved the entire $10,000 item.

As to the wagon company fees, the court was plainly right. Duffin received $7,500 during that year, which he entered as payments upon the old balance of $16,000, which was due him wholly for fees. The question is whether he may deduct miscellaneous charges for expenses, which accrued in 1921. We do not question that a lawyer who had charged a client for services and expenses, and who received a general payment on account, might rightly allocate that payment, so far as necessary, to his reimbursement for expenses, and consider only the remainder as paid for services; but Duffin did not do this. He credited the $7,500 on his old fee account, and he charged his expenses in a new account which was carried along into succeeding years; and it may well be assumed that he collected these expenses, as such, in the succeeding years.

As to the $10,000 item, we also think the commissioner and the court were right, though this is far from clear. The States Oil Company owed Duffin $10,000 for fees. It could not pay, and its financial situation was such that it had no credit. In 1922 it gave Duffin on this account its two $5,000 notes. Presumptively this would not be payment of the debt until the notes were paid, and Duffin bases upon that presumption his insistence that he did not receive payment in that year. However, he indorsed the notes, turned them over to the insurance company, further secured them by depositing collateral, and received from the indorsee the full face of the notes. He thus had payment, subject only to his liability to return the money if the maker did not pay. The notes were renewed once during 1922 and eventually were paid, several years later. If Duffin had borrowed this $10,000 from the insurance company upon his own note, and used these notes as collateral, the amount received would not have been income; and what he did do was not very different in substance—particularly as the indorsee must have made the advance solely on the credit of the indorser, Duffin; but he deliberately (and doubtless for important reasons) adopted the form of making a sale of the notes, and so, we think, elected to treat the amount as income for that year rather than for the future year when they might be paid, and became protected against liability by his right to treat as a loss what he might have to pay in some later year to make good his indorsement.

In 1924, the only item as to which complaint is now made against the District Court judgment, relates to a profit on the sale of stocks and bonds. Duffin reported $15,000. The commissioner added about $2,000, and the District Court upheld the addition. Upon an examination of the findings and proofs, we think they justify this result. The District Court set aside the fraud penalty assessed for this year and, that being eliminated, the $2,000 item becomes relatively unimportant. The evidence shows that as the result of payments aggregating $50,500 which had been made by Duffin in previous years, he became the owner in 1923, of a lot of second mortgage bonds of uncertain value. $13,000 of these were paid in full and retired in 1923, and in 1924 Duffin received $32,000, being the full face value of an additional lot then paid. Including this payment, he was still $5,000 short of getting his cost back. In such a situation, there are two methods of computing that profit which becomes taxable income. One is to treat the transaction as a unit and find no profit until the total cost has been returned, and then allocate the entire profits to the later periods; the other way is to apportion the total cost among the total securities acquired, and treat as profit in the year received the difference between the cost so ascertained and the face value thus received. No statute or regulation in force in 1924 has been observed which fixed any arbitrary rule as to which method more truly reflects the income. We assume, without deciding, that the particular facts

of the case may determine the rightful method, and that the taxpayer's choice of method should not be rejected unless clearly wrong. For 1924 Duffin adopted the second method, and reported as income the amount which he thus computed. There is no sufficient reason for excusing him from the choice thus made. The difference between his figures and the commissioner's seems to arise through the inclusion by Duffin in his cost basis of the value of some property, which, in addition to the cash, formed part of his cost. The defendant contends that this property was of a highly speculative nature, and that Duffin has failed to prove that it had any value at the time he parted with it. This contention seems to be correct. The judgment of the court below for this year must be affirmed.

The remaining contests relate to the penalties which were imposed by the commissioner for fraud. The total was about $26,000; the District Court reduced the amount to about $21,000. Section 250 (b) of the Revenue Act of 1918 (40 Stat. 1083), after providing for cases of understatement in the return for which the taxpayer is not at fault, and for those in which he is guilty of negligence, declares that when the understatement has been false or fraudulent with the intent to evade the tax a penalty of 50 per cent. upon the amount of the deficiency assessment shall be imposed. The Revenue Act of 1921, § 250 (b), 42 Stat. 264, after providing for a deficiency assessment resulting from a review of the return, provides that "If any part of the deficiency is due to fraud with intent to evade tax," then there shall be added 50 per cent. of the total amount of the deficiency.

We find no helpful decisions as to the application of these penalties. It may well be doubted whether power can rightly be conferred upon an administrative officer to find a citizen guilty of a felony (which a fraudulent return is) and punish him therefor;[2] but, assuming that this power exists, what is the status of its exercise when under judicial review? In appropriate cases there is a presumption that the commissioner's action was rightful; but it is a fundamental rule of judicial procedure that fraud cannot be lightly inferred but must be established by clear and convincing proof. It may well be that the right to due process would be

infringed by a rule of procedure which abolished this fundamental principle and authorized a finding of fraud—at least, if involving a felony—to be based on that minimum called "any substantial evidence." Certainly, as we think, in a suit to recover back such a penalty, the general presumption that the commissioner was right has no evidential effect of itself sufficient to support a judgment affirming the penalty, its effect being procedural only; and the rule that a finding of fact by the judge in the District Court will be affirmed by us if there is any substantial evidence to support it, does not avail to sustain such finding of fraud if we conclude that the proof relied upon is insufficient in law to be rightly regarded as clear, convincing or satisfying.

The 1921 act is explicit that if any part of the deficiency is due to fraud, the penalty shall be computed upon the total deficiency found. The 1918 act is not so clear in this respect, but we think it must be so construed. In the District Court the plaintiff recovered partial amounts of the taxes which he had paid in some years, and recovered what were taken to be appropriate portions of the penalties. We consider that the entire penalty is valid if any substantial amount of the deficiency was due to a fraudulent understatement of income in any particular. It obviously follows that, giving this broad effect to what may or may not be called fraud in some relatively small transaction, there is a greater necessity for finding the evidence of fraud to be strong and convincing. Of course, if the deficiency assessment is necessarily reduced by eliminating items of income which were part of its basis, the penalty will lessen correspondingly.

The same statutes provide that, if the understatement is due to negligence or (in 1921) to nonobservance of rules and regulations of which the taxpayer has knowledge, there should be a penalty of 5 per cent. of the deficiency, and with specified interest. We at once meet the question whether if, in any year, the fraud penalty is set aside by the court, and it seems to the court upon the proofs that the commissioner might rightly have imposed the negligence penalty, the court may sustain the assessment to the lesser amount. We think not. The assessment of the negligence penalty is an administrative act, involving a zone of judgment akin to discretion. It does not follow, on the principle that the greater includes the less, that a finding of fraud necessarily involves a finding of negligence. In some cases, proofs develop

---

[2] The penalty is imposed without notice or hearing, excepting as upon an abatement or refund claim the taxpayer may present his complaint as to this matter about which the commissioner has already made up his mind.

one from the other, but in many cases they are entirely distinct. Upon given proofs of understatement, negligence is not the necessary alternative to the conclusion of no fraud. If the charge of fraud fails, there may be no fault whatever appearing. We think the taxpayer is entitled to have the judgment of the commissioner exercised specifically upon the issue of negligence, and entitled to whatever administrative review of that conclusion the law at the time may provide. It follows that if the fraud penalty is not to be sustained in its entirety by the court, it must be entirely set aside.

■ We proceed to consider the proof. We note first the characterizing fact that the personal antagonism which developed between plaintiff and the officials handling the matter was said by the District Judge, in his opinion, to be "so intense that I do not think I should uphold any action of the Commissioner on a mere presumption." It is not impossible that evidence of a fraudulent intent in making one tax return would be admissible upon the issue of intent in another year's return; but if that can ever be done, it should not be here. The items which make up the alleged understatement in one year and in another are so different in their character and in the circumstances and reasons which tend to support or to dispute the inference of fraud, that we think it not permissible to rely upon the understatements which were made in the 1919 return to constitute substantial evidence of a fraudulent intent as to those which were made in that for 1920; and the converse must be even clearer.

There is no object in recounting the understatements made for 1919 and 1920, or the other circumstances bearing on the issues for those years. As to some of these, the explanations are forceful—indeed, as to several of the items Duffin was right—but as to some, the difficulty of reconciling them with an honest intent is so great that we must treat them as sufficient to support the finding of the District Judge. We assume that upon further proceedings in the District Court counsel will be able to agree upon the amount of the deficiency assessments. When this is done, the amount of penalties for these years will be correspondingly reduced.

■ In 1921, the only fraud charged is the omission of the $8,575 item from the Kentucky Wagon Company. As we have disap-

proved the finding upon this subject, and the issue whether Duffin did or did not wrongfully omit this item must be tried again, the penalty judgment which depends thereon must also be vacated.

■ In 1922 two omissions are said to show fraud: (1) From the $7,500 payment which came from the Wagon Company Duffin deducted his counterclaim for expenses and reported only the remainder as income. He was not entitled to make the deduction, but we see nothing justifying an inference of fraud. (2) He omitted from his return the $10,000 fee from the States Oil Company. Until the courts examined and characterized this transaction as constituting income in 1922, the propriety of its inclusion was too doubtful to make its exclusion evidence of fraud. The judgment for the 1922 penalty cannot stand.

■ The case is remanded for a new trial as to the $8,575 item and the penalty for 1921. Under what we think the proper application of Gasoline Products Co. v. Champlin Co., 283 U. S. 494, 51 S. Ct. 513, 75 L. Ed. 1188, this does not of itself imply the right of either party to a new trial on any other item. We assume that, in the light of this opinion, counsel will be able to agree upon the necessary modifications in the judgment as to the other items which we have discussed, including appropriate interest; but we do not foreclose the right to some further hearing in the court below as to some one or more items. That question, if raised, the District Court will decide. Accordingly, the judgment is in part affirmed, in part reversed, and in part modified, and the case is remanded for proceedings in accordance herewith.

The foregoing opinion was, except as to a few minor changes and the two items hereafter mentioned, prepared by Judge DENISON prior to his retirement from the bench. In conference he dissented from the disposition here made of the item of $10,000 found by the District Court to be a dividend received in 1919 in the Curd-Blakemore stock transaction, and from the inclusion of the year 1920, with 1919, in the assessment of fraud penalties. Time did not permit the filing of a dissenting opinion, but the fact of such dissent and the authorship of the opinion, except as modified as to the above items, should be here noted.