THEODORE A. GRANGER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Granger v. Commissioner
Docket No. 9551-76.
United States Tax Court
T.C. Memo 1978-62; 1978 Tax Ct. Memo LEXIS 453; 37 T.C.M. (CCH) 313; T.C.M. (RIA) 780062; February 21, 1978, Filed Charles R. Engle, for the petitioner. Ruud L. Duvall, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined a deficiency of $3,813.62 in petitioner's Federal income tax for the year 1973. The only issue for decision is whether the petitioner is entitled under section 166 of the Internal Revenue Code of 1954[1] to a bad debt deduction in 1973 relating to a sale of residential real estate during 1959. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation *454 of facts and the exhibits attached thereto are incorporated by reference and are found accordingly. Petitioner Theodore A. Granger resided in Arlington, Virginia, at the time of filing his petition in this case. He filed his 1973 Federal income tax return with the Internal Revenue Service Center in Memphis, Tennessee. During 1958 and 1959, when petitioner resided in Henderson, North Carolina, he was engaged in a variety of building construction activities, [2] which included designing and building residential dwellings. Sometime during 1958, he began construction of a house on Lot 33 of White Oak Drive in Henderson, [3] which he at least substantially completed by the end of that year. Although petitioner did not intend originally to sell the dwelling, he agreed, after being approached by the mayor of Henderson, to discuss the possibility of a sale with one Sidney Rubin. Rubin was connected with Pickle Pack Products, a New York firm which was relocating in Henderson. Petitioner met with Rubin in January 1959, and, after some discussion and an inspection of the premises, petitioner and Rubin orally agreed on the transfer of the property for $28,000. [4]
*455 Although Rubin expressed satisfaction with the basic design and construction of the house, he made periodic oral requests of petitioner, prior to the July 1, 1959, closing date, to effect certain customizing changes. Rubin's first requested and authorized change involved the installation of central air conditioning. Originally, petitioner and Rubin agreed orally on a system costing $1,100, which amount was added to the initial sales price of $28,000 for the house. However, they subsequently decided, again orally, to substitute a system costing $2,600, which would produce less noise interference for Rubin and his family. Rubin was to compensate petitioner with a lump-sum amount for the additional $1,500. No further adjustment was made to the underlying $29,100 sales price of the house. Subsequent changes, the arrangements for which were all made verbally, [5] included: converting an open carport into an oak-paneled recreation room and formal entrance hall, installing a wet bar and liquor cabinet; constructing a pantry between the dining room and kitchen; replacing both the original kitchen cabinets with cabinets shown in a home decorating magazine and the originally installed *456 kitchen range with a more expensive model; adding a glass shower enclosure in the second floor bath; and installing both a shower in the unfinished basement and a laundry chute from the second floor to the basement. Petitioner completed most of these modifications by the closing date, thereby personally incurring substantial additional costs. Although Rubin made some small advancements to petitioner for such items totaling $2,093, petitioner had expended approximately $6,200 more than he received from Rubin by the time of closing.
To finance the purchase of the property, Rubin sought and obtained a mortgage loan in the amount of $22,700 from Home Savings and Loan Association in Henderson. An oral arrangement concerning the execution of an unsecured, 3-year personal note in the amount of $4,500 was also made between petitioner and Rubin. Title closing on the property occurred on July 1, 1959, and title to said property was transferred by warranty deed from petitioner and Elizabeth T. Granger to Sidney D. and Muriel Rubin. Federal documentary *457 stamps attached to the deed show the amount of consideration as $29,100, which amount was acknowledged in the deed as paid. However, there is no documentary evidence as to the manner in which the consideration was to be paid. The deed was recorded on July 1, 1959, in the Vance County, North Carolina, Register of Deeds office. At the closing petitioner received a total payment of $24,600 consisting of $20,000 [6] of the mortgage proceeds and $4,600 directly from Rubin.However, Rubin did not execute the $4,500 personal note at that time because he contended that certain items in the house remained to be completed. Petitioner was astounded by Rubin's refusal to execute what petitioner thought was their agreed-upon note. All subsequent efforts to convince Rubin to sign the note proved fruitless. Consequently, petitioner, in an effort to recoup some of the substantial amounts which he had expended on the property, entered into a written memorandum of agreement with Rubin on September 22, 1959. The essence of the written agreement, the stated *458 purpose of which was "to avoid any possibility of misunderstanding between the respective parties," was that Granger was required to finish numerous, substantial (and previously unmentioned) tasks with respect to the property. In return, Rubin promised to deliver $750 upon the signing of the contract [7] and $750 upon completion of the work. Rubin and his wife also agreed to execute a 3-year note in the amount of $4,500 plus interest at 5 percent per year "when the building is completed and satisfactory." The note was to be incorporated as part of a possible repurchase agreement between the parties. Following the execution of the September 22 agreement, petitioner commenced work on the items contained therein. After he had substantially completed the work required under the agreement, Mrs. Rubin expressed dissatisfaction with the basement floor tile that she had chosen. She demanded that petitioner tear up the floor and install tiles of a different color. Petitioner refused and left the job. The $4,500 note was never executed, and petitioner received no further payments from the Rubins. After petitioner ceased work on the Rubin property, *459 he began to contact attorneys throughout the state of North Carolina about the possibility of recovering any amounts from Rubin. These efforts yielded no results, and the only legal action which petitioner ever instituted was the filing of a "Notice of LisPendens" in June 1964 with the Superior Court of Vance County. However, petitioner never filed a complaint with respect to the lispendens action, and the notice was subsequently stricken from the record at the request of Rubin's attorney, Robert S. Hight. There is no evidence of record that petitioner made any attempt to recover any money from the Rubins after 1966. The Rubins sold the property to Ronald and Charlotte Sprinkel in January 1973. Throughout the period during which he held the property in Henderson, Rubin could have satisfied the amounts which petitioner contended were owed him. Rubin never acknowledged any obligation to petitioner for the claimed amounts, and, in fact, Rubin contended that petitioner owed him money for the costs which Rubin subsequently incurred in having the house completed and repaired. On his 1973 Federal income tax return, petitioner claimed a business bad debt deduction *460 of $10,769.28 relating to the construction and sale of the residence in Henderson to Rubin during 1959. Upon audit, respondent disallowed the deduction on the grounds that no valid and enforceable debt obligation ever existed between petitioner and Rubin, and, that even if a debt had existed, it became worthless prior to 1973. OPINION To establish entitlement to a business bad debt deduction for a taxable year pursuant to section 166 of the Code and the applicable regulations thereunder, [8] petitioner essentially must show: (1) the existence of a bona fide debt; (2) which became worthless; (3) during the taxable year in which it is claimed as a deduction. Where, as here, virtually all of the arrangements surrounding the underlying transactions were made orally at a point in time 18 years removed from the trial, the burden, as a practical matter, becomes more difficult to meet. *461 Nevertheless, petitioner contends that the sale of the property to the Rubins in mid-1959 created a valid and enforceable debt obligation from the Rubins to petitioner, which continued to have some worth until 1973. The debt became worthless in 1973, according to petitioner, when the Rubins sold the property to the Sprinkels and failed to compensate petitioner from the proceeds of such sale for the amount claimed to be owed to him. Unfortunately for petitioner, we are unable to accept his contentions and to permit him the deduction which he claims. In our view it is questionable, in light of the circumstances of this case, whether an enforceable debt obligation was ever created between petitioner and the Rubins. Moreover, even if a bona fide debt did exist, it did not become worthless in 1973. Oral transactions, such as we are presented with in this case, may well be "customary" in "little communities" like Henderson. However, the scope of the instant transactions, especially in view of the list of requested modifications and the lack of prior dealings between petitioner and Rubin, should have prompted petitioner, a builder, to memorialize at least the essentials of the *462 parties' agreements. The documentary evidence of record indicates simply that the property was transferred from petitioner to the Rubins on July 1, 1959, for $29,100. There is scant documentary indication of the manner in which the consideration was to be paid from Rubin to petitioner. Moreover, there is no documentation with respect to specific arrangements for the modifications requested prior to the closing date. As for the "unpaid $4,500 note," the record reflects only an unexecuted note, which, even if it had been signed, would have been a personal, unsecured obligation. Although the record reflects that the entire $29,100 purchase price was never paid, a substantial portion of it was paid, and what remained was not paid by Rubin because he felt the house, although habitable, was not totally finished as requested. On the facts as presented, petitioner may have had some claim against Rubin. However, such claim, if it did exist, was never adjudicated. An unadjudicated claim is not sufficient to entitle petitioner to a bad debt deduction under section 166 of the Code. See Schaff v. Commissioner,46 B.T.A. 640 (1942). Even assuming the existence of a valid *463 debt created by the parties in 1959, petitioner's failure, for whatever reason, to initiate and pursue fully legal proceedings with respect to such "debt" caused the debt to become unenforceable long before 1973. Although the record is not altogether clear, the underlying contractual "claim" on which petitioner bases his bad debt deduction appears to have arisen on the July 1, 1959, closing date. North Carolina law provides a statute of limitations period for contract actions generally of 3 years. See N.C. Gen. Stat. Sec. 1-52(1) (1969). Such a period would be applicable in this case because there is no evidence of a contract under seal for which the requisite statutory period would be 10 years. See N.C. Gen. Stat. Sec. 1-47(2) (1969). Thus, after 1962, petitioner's claim against Rubin would have been barred, and consequently unenforceable, by virtue of the running of the statute of limitations.[9]
Although the running of the statute of limitations *464 does not, of itself, establish the "worthlessness" of a bona fide debt, Stein v. Commissioner,4 B.T.A. 1016 (1926), it does place upon petitioner the burden of justifying the charge-off of the debt in a later year. To meet this burden petitioner must show either the occurrence of an event which tolled the statute of limitations or the fact that he had substantial reason to expect payment. Duffin v. Lucas,55 F. 2d 786 (6th Cir. 1932). [10] Petitioner has failed to make such showing and the facts plainly demonstrate that Rubin gave petitioner no reason whatsoever to expect payment after the statute of limitations period had run.
Finally, there is no evidence that the "debt" became "worthless" in 1973. The sale of the house by the Rubins to the Sprinkels during 1973 is merely an appendix to the story of this transaction which had its first chapter in 1958 and its epilogue, at the very latest, in 1966, when petitioner made his final effort to obtain recovery from Rubin. If a debt had existed, and if Rubin had acknowledged both its existence and *465 his own liability thereon, he could have paid it off at any time throughout the period involved. He would not have needed the sales proceeds obtained from the transfer of the house during 1973 to make such payment. Accordingly, since petitioner has not established the existence of a bona fide debt which became worthless during 1973, we hold that he is not entitled to a bad debt deduction in that year under section 166 of the Code. Decision will be entered for the respondent. Footnotes
1. All Code references are to the Internal Revenue Code of 1954, as amended.↩
2. For information relating to other aspects of petitioner's construction-related activities during this period, see Granger v. Commissioner,T.C. Memo. 1970-155↩. 3. At the time, Lot 33 was owned by petitioner and his wife, Elizabeth T. Granger. ↩
4. According to petitioner, the $28,000 price for the house reflected merely his direct cost, without charges for overhead or normal profit. Apparently, petitioner desired to extend his own generous welcome to the migrating Rubin.↩
5. According to petitioner, oral arrangements such as he had with Rubin were "customary" in the "little community" of Henderson.↩
6. The remaining mortgage proceeds were apparently applied toward the purchase by Rubin of the two lots on either side of Lot 33.↩
7. Rubin did pay this amount.↩
8. SEC. 166. BAD DEBTS. (a) General Rule.-- (1) Wholly worthless debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. SEC. 1.166-1 [Income Tax Regs.] Bad debts. * * *
(c) Bona fide debt required. Only a bona fide debt qualifies for purposes of section 166. A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. * * * SEC. 1.166-2 [Income Tax Regs.] Evidence of worthlessness. (a) General rule. In determining whether a debt is worthless in whole or in part the district director will consider all pertinent evidence, including the value of the collateral, if any, securing the debt and the financial condition of the debtor. (b) Legal action not required. Where the surrounding circumstances indicate that a debt is worthless and uncollectible and that legal action to enforce payment would in all probability not result in the satisfaction of execution on a judgment, a showing of these facts will be sufficient evidence of the worthlessness of the debt for purposes of the deduction under section 166. SEC. 1.166-3 [Income Tax Regs.] Partial or total worthlessness. * * *
(b) Total worthlessness. If a debt becomes wholly worthless during the taxable year, the amount thereof which has not been allowed as a deduction from gross income for any prior taxable year shall be allowed as a deduction for the current taxable year.↩
9. Even if a portion of petitioner's claimed bad debt deduction were attributable to amounts arising under the September 22, 1959, memorandum of agreement, our conclusion would be the same.↩
10. See Algy Inc. v. Commissioner,↩ a Memorandum Opinion of this Court dated December 23, 1952.