BROOKLYN AND RICHMOND FERRY CO., INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 11074, 11756. Promulgated October 30, 1947.

*Robert J. Bird, Esq.*, and *Francis E. Jasper, Esq.*, for the petitioner. *Scott A. Dahlquist, Esq.*, for the respondent.

872

OPINION.

Disney, *Judge*: The substance of petitioner's argument upon brief is that the amounts in controversy represent consideration paid by Electric Ferries, Inc., to its sole stockholder for the right to vote her stock and thus be in a position to control and manage petitioner's affairs; and that therefore they are not taxable to the petitioner. Respondent, upon brief, first contends that, as the payments were first received by petitioner in the form of tolls collected in conducting its ferry business, the amounts constitute income of petitioner; also that, though it is contended that the amounts were not rental, if they were rental they could only be rental for the use of the petitioner's assets, thus income to the petitioner, though paid directly to the stockholder.

The original agreement of February 8, 1939, provided in paragraph "First" for the payment by Electric Ferries, Inc., to the stockholder "as an operating expense of the business," 10 per cent net, of the gross income of petitioner, payable monthly. The words in quotation marks were eliminated in the amendment made on November 10, 1939, and did not appear in the contract at any time thereafter. The amounts in question were paid by Electric Ferries, Inc., not by the petitioner, and were claimed as operating expense deductions in income tax returns filed by the former. Paragraph "Ninth" of the agreement does not, as respondent contends, clearly make the obligation payable out of ferry tolls collected by petitioner. The transaction contemplated that petitioner would charter one or more ferries from Electric Ferries, Inc., on a bare boat basis. The paragraph in question provides for the deposit of receipts from tolls in a bank

account under petitioner's name and that no money should be disbursed therefrom by petitioner to pay officers' salaries, dividends, charter hire to Electric Ferries, Inc., or nonoperating expenses, until after the stockholder was paid her monthly payment, covering gross income for the preceding month, as provided for in paragraph "First."

In paragraph "Sixteenth" it is agreed that the ferry company and the stockholder shall allow the lessee up to $2,000 to be expended on repair and maintenance of terminal facilities, and "The Lessee shall be entitled to cause the Ferry Company to withhold out of payments to be made to the Stockholder hereunder, an amount not to exceed Five Hundred Dollars ($500) per month until such allowance has been fully liquidated." These provisions of the original agreement leave it doubtful as to whether the payments to the stockholder were dependent upon the income of petitioner. However, on May 15, 1939, the original agreement was modified, by agreement of all parties, the quoted provision as to $2,000 was stricken, Electric Ferries, Inc., paid $200 and advanced $1,500 under paragraph "First" of the original agreement, and that paragraph was modified, as to the 10 per cent to the stockholder, to read, "ten percentum net from the gross income from the operation of the said ferry line or business from whatever source derived, payable monthly on the 10th day of each month beginning June 10, 1939, covering the gross income from the preceding calendar month." It is to be noted that, as modified, the payment of 10 per cent was to be *from* the income of the ferry line. Still later, on November 10, 1939, the language just above quoted from paragraph "First" of the original agreement was, by agreement of the parties stricken, being substituted by an agreement of the lessee to pay to the stockholder "annual rental" of $24,000, provided that if gross income exceeds $400,000, the lessee will pay the stockholder "an additional sum representing ten per cent (10%) of all such gross income in excess of Four Hundred Thousand Dollars ($400,000.00)." Paragraph "Twelfth" was also amended to provide, in part, that if the ferry company, because of reduction of rates by New York City on a certain other ferry, "is unable to meet its expenses of operation including reasonable charter hire, the stockholder agrees to discuss with the Lessee an adjustment and revision of the guaranteed annual rental of * * * $24,000." Again, on December 1, 1941, the agreement was modified, as to paragraph "First," to state, *inter alia*, that the ferry company and stockholder rent, lease, and set over to the lessee, and the lessee accepts the management and control of the ferry company from the stockholder and the lessee agrees to pay to the stockholder annual rental of $34,000. Thus it is seen that during 1942 and 1943, two of the taxable years here at hand, and for the last two months of 1941, the stockholder received a flat rental of $34,000, while for 1940

and 1941 (up to November 1, 1941), she received from the lessee a flat rental of $24,000 plus $13,222.76, "representing ten percent (10%) of all such gross income" above $400,000, while in 1939 (prior to the amendment of November 10, 1939) she received from the lessee "ten percentum net from the gross income" of the ferry line. We therefore regard as not important the provisions effective prior to the taxable years, and do not base our conclusion thereon. During the entire period, however, both the ferry company and the stockholder were in form renting and leasing the "management and control" of the ferry company, and under the original agreement, not modified in this respect, the lessee was entitled, through its management of the ferry company "to possession of the Franchise and rights of the Ferry Company, and by reason thereof shall be entitled to possession of all of the physical assets of the Ferry Company for the use and operation of the said Ferry Company and the said Franchise and all equipment and appliances appurtenant to the said business." Paragraph "Seventh" provided for the return to the ferry company, upon termination of the agreement, of "possession of all physical assets owned as of March 1st, 1939 in good order and condition, usual wear and tear excepted."

Upon consideration of these instruments, we conclude that throughout all years covered by the agreement there was a contract of the general nature of a lease to Electric Ferries, Inc., by the petitioner, of the management and control of petitioner, even though after the amendment of November 10, 1939 (effective November 1, 1939), the payments were not to be a percentage "from" the gross income of the ferry company, but an "annual rental" (together with 10 per cent, "representing" 10 per cent of gross income above $400,000, until the amendment of December 1, 1941, effective November 1, 1941). The agreement made could not have been made by the stockholder alone. It was, and continued to be, that of the corporate petitioner, as the owner of the physical assets, the management and control, and possession of which was delivered to the "lessee." Neither contracts nor amendments provide at any point for the transfer of the right to vote the stockholder's stock, emphasized by the petitioner as the crux of its argument, except as follows: It is provided that the stockholder transfer the ownership of the capital stock to the lessee by placing it in the hands of an escrow agent, but he merely acted "according to the terms of this agreement for the benefit of the parties hereto," and it was agreed that he, or the stockholder, would elect a board of four directors, three to be nominees of the lessee and one the nominee of the stockholder. Nowhere in the agreement can we find language setting forth the mere transfer of power to vote stock which the petitioner seeks, in effect, to segregate from the rights and powers and

property of the corporation. The agreement was "for the mutual benefit of each of them," and each agreed to assist in the operation of the ferry line, and in maintenance of the franchise and the successful promotion of the business. The ferry company, stockholder, and lessee alike were to instruct the escrow agent as to delivery of stock certificates, books, or other property held by him at his resignation. He was to hold the stock for the benefit of the parties. The stockholder had a right to receive monthly reports and to inspect the ferry company's books. All of these elements of agreement prove clearly, we think, that there was no simple sale of right to vote stock, as argued by the petitioner. Although, as to the taxable years, we do not regard the payments to the stockholder as being directly from the petitioner, and although there was not a lease of property in the fullest sense by the corporation, there was a contractual arrangement between petitioner and "lessee," as well as stockholder, so similar in nature to a lease as to be called so by the parties. The petitioner's idea that the payments related only to a grant of right to vote stock is altogether too narrow, in view of all the facts here involved.

It is well settled that a taxpayer may be charged with the receipt of taxable income paid directly to another pursuant to an arrangement previously entered into. *Lucas* v. *Earl*, 287 U. S. 111; *United States* v. *Joliet & C. R. Co.*, 315 U. S. 44.

In the *Joliet* case, *supra*, the taxpayer leased its railroad property in perpetuity on terms requiring the lessee to pay to the lessor's stockholders an annual dividend of 7 per cent of the par value of the shares, without any deduction for Federal tax, and to pay any taxes due the United States on account of the dividends so paid. The Court held that the lessor realized income in the amount of the dividends paid by the lessee to its stockholders. We think the situation here is in principle the same. There was a contract in the nature of lease by the petitioner, an essential part of the agreement by all parties.

The substance of the agreement is that for a consideration payable, without regard to the amount of petitioner's income, to petitioner's stockholder (during most of the taxable periods here involved) Electric Ferries, Inc., agreed to manage petitioner's affairs. Dividends in amounts not disclosed by the record were paid to Electric Ferries, Inc., but they were not referred to in the income tax returns filed by petitioner for the taxable years. In addition, Electric Ferries, Inc., received about $27,000 each year as management fees and large amounts for charter hire of its boats.

The petitioner owned valuable assets over which its control was absolute. The franchise, its most valuable asset, was unassignable and the rights conferred upon Electric Ferries, Inc., could not have been given without continued operation by petitioner. Petitioner

for a consideration payable directly to its sole stockholder, and with her concurrence, gave certain rights to Electric Ferries, Inc. These rights enabled Electric Ferries, Inc., to fix the charter rate of ferries chartered to petitioner and to obtain management fees and dividends. The vice president of Electric Ferries, Inc., regarded these rights as having great value to Electric Ferries, Inc. The arrangement was thus one of contemplated profit to Electric Ferries, Inc., and it assured the stockholder of a return on her investment in stock of petitioner. It is apparent that without such considerations the agreement would not have been entered into.

Here, as in the *Joliet* case, the stockholder received the payments as the direct result of her status as an owner of petitioner's stock. Without the stock and the right it conferred to dividends out of profits, she could not have entered into the arrangement. Her right to receive the moneys here involved were "derivative in origin," in the words of the *Joliet* case. The fact that the payments were made by Electric Ferries, Inc., out of its own funds is not helpful to petitioner. The dividend was paid by the lessee in the *Joliet* case, and was payable irrespective of financial results of the operation of the lessor's property. Here, petitioner agreed to the arrangement, and consented to the use of its property under new management for a money consideration payable to its sole stockholder, the only person entitled to its net earnings, and net assets upon dissolution. This was an exercise by petitioner of power to dispose of income and amounted to the realization of the income by it. Regulations 74, article 70 (now Regulations 103, section 19.22 (a)–20; and Regulations 111, section 29.22 (a)–19), discussed in the *Joliet* case, is pertinent here. Of it the Court said:

That long standing regulation is plainly applicable here. It covers various kinds of conveyances and leases including those where the grantor or lessor has parted with all rights of management and control over property. * * *

In our opinion, this is one of such cases. See also *Helvering* v. *Horst*, 311 U. S. 112. We think the rationale of the *Joliet* and *Horst* cases applies and, accordingly, sustains the action of the respondent in including the amounts in question in gross income of petitioner.

The petitioner filed income and declared value excess profits tax returns on Form 1120, but, on advice of the manager of the tax department of the accounting firm which was engaged to prepare its returns that the payments made by Electric Ferries, Inc., to the stockholder did not constitute taxable income to petitioner and that, without such income included, losses were sustained each year, timely excess profits tax returns were not filed by petitioner.

The facts show that petitioner acted in good faith and that the accountant entrusted with determining whether the filing of the

returns was necessary considered the subject in the light of the Commissioner's regulations and court decisions. The accountant's qualifications to advise petitioner were conceded by the respondent at the hearing. The mere fact that, according to the conclusion reached by us in this proceeding he did not reach the correct result, is not fatal to petitioner. The facts here distinguish the case from *A. G. Fides*, 47 B. T. A. 280; affd., 137 Fed. (2d) 731; and *P. Dougherty Co.*, 5 T. C. 791; affd., 159 Fed. (2d) 269, relied upon by the respondent. Reasonable cause is present here for failure to file the returns on time. See *C. R. Lindback Foundation*, 4 T. C. 652; affd., 150 Fed. (2d) 986; *Safety Tube Corporation*, 8 T. C. 757; *Hatfried, Inc.* v. *Commissioner*, 162 Fed. (2d) 628. On this issue we hold for the petitioner.

*Decision will be entered under Rule 50.*