Plastic Parts Development Corp. v. Commissioner.
Plastic Parts Dev. Corp. v. Commissioner
Docket No. 26686.
United States Tax Court
1951 Tax Ct. Memo LEXIS 190; 10 T.C.M. (CCH) 584; T.C.M. (RIA) 51191; June 18, 1951
Harold Wisan, Esq., 111 Broadway, New York, N.Y., for the petitioner. John E. Mahoney, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This case involves a deficiency in income tax of $169.74, a deficiency of $9,030.01 in personal holding company surtax, and a 25 per cent penalty in the amount of $2,257.50, all for the fiscal *191 year ended October 31, 1946. Only the $2,257.50 as 25 per cent penalty is placed in issue. Findings of Fact Petitioner is a personal holding corporation incorporated with a capital of $3,000 in November 1945. It filed with the collector for the fifth collection district of New Jersey a corporation income and declared value excess profits tax return, and an excess profits tax return, both for the petitioner's first fiscal year, ended October 31, 1946. It did not file, and had never at any time, up to the hearing, filed a personal holding company return for the taxable year here involved. Petitioner was organized by Islyn Thomas, Benjamin H. Shapiro and John Hohl. After the incorporation three shares of stock, out of sixty issued equally to the three men, were given to one Edwards, an attorney and friend of Thomas and Shapiro. He had incorporated the company, without charging a fee. He became secretary. He was not experienced in tax matters. He acted as counsel for petitioner but did not attempt to advise on tax matters. He did not consider himself qualified to do so. Thomas, Shapiro and Hohl had been partners before the incorporation in the matter of some patents issued or pending *192 on toys that the three had developed, and tools, plans and dies worked out for manufacture of toys. These, including rights under a patent upon which royalties were already accruing, were turned into the corporation. They wished to limit their personal liability. The intent was to manufacture patented items of toys. Some effort was made to manufacture but there was difficulty in procuring machinery, and at the end of the first fiscal year no manufacturing had been done and the only income was from royalties. The company never engaged in manufacturing. Thomas was an engineer who had attended the University of Scranton and Columbia University and had been an instructor of engineering in Brooklyn Polytechnic Institute for two years. He taught designing and engineering of plastic molds. He did not have a degree in engineering. He never took a course in tax law or taxation. He left school in 1930 and was thereafter engaged in the manufacture of plastic parts. After being works manager of Ideal Plastic Corporation and chief engineer of Consolidated Motor Products at Scranton, Pennsylvania, he started Thomas Manufacturing Corporation. Hohl had an engineering degree from the Newark Engineering *193 School. He organized Newark Die Company about 25 years ago. The company made tools and dies for the plastics industry. Hohl died about 1948. Shapiro was president of the Acme Plastic Toys Company, manufacturers and sellers of toys, merchandising toys to chain stores. Its sales volume was about $2,000,000. Neither Hohl nor Shapiro manufactured metal parts. The accounting firm of Simonoff, Peyser & Citrin had been recommended to him about 1940 by his attorneys and by a bank. They were recommended as tax experts. They were the first accountants for Shapiro's company, Acme Plastics, and handled all of its tax matters and auditing. They were satisfactory to Acme Plastics. Shapiro never took a course in tax law and did not know there were special sections of law pertaining to personal holding companies. No one in Simonoff, Peyser & Citrin informed him of that and the first time he knew it was in connection with a notice from the Internal Revenue Bureau. He relied on Peyser, also on Musterer and Ilson, employees of the accounting firm, and had done so since he retained the firm for his own company, Acme Plastics, about 1940. Shapiro spent little time in the affairs of petitioner and never *194 signed any papers on its behalf. He was not present when the firm of accountants was employed and did not know of the terms of employment. He had read about holding companies in the market sheet of the newspaper. He never inquired of the accountants as to whether petitioner was a personal holding company. Petitioner has been inactive for about two years. It still holds the earnings that it made in the period ending October 31, 1946, less taxes paid and dividends paid. Dividends amounted to about $3,000. Hohl, Shapiro and Thomas had business and social contacts prior to the incorporation of petitioner. Shapiro and Hohl took little active part in the operation of the petitioner. They tried to obtain for the petitioner items that were difficult to obtain. One Harold Frutchey was employed by the petitioner. He helped to develop and design and had outside companies design dies for toys, and attempted to secure raw materials and machinery. Some models or plans for toys were developed. Thomas became president of the petitioner and managed it and Frutchey was responsible to him. Thomas consulted with Shapiro and Hohl as to trying to get materials. Thomas had employed Simonoff, Peyser *195 & Citrin in connection with the organization of his company, Thomas Manufacturing Corporation. They set up his company with the necessary books. The firm had previously been doing work for Shapiro who had retained them for Acme Plastic Toys. Thomas, therefore, retained the firm to do auditing and all tax work for the petitioner, including preparation of ncome tax returns and other matters, and advice, and setting up the books. The returns filed by the petitioner for the year ending October 31, 1946, were signed by Thomas after being sent to the petitioner by Simonoff, Peyser & Citrin, prepared ready for signature. The returns bore the signature of Peyser as having prepared them. The firm had made for the petitioner monthly audits. This was done by Musterer and assistants. Thomas told them who the stockholders of petitioner were and how many there were. They had full access to all of petitioner's records pertaining to income. Petitioner's books were open to them. They set up the petitioner's books of account, including capital account, when the company was organized. They verified the stock that was issued. The retainer of the firm included anything pertaining to auditing or tax work. *196 Thomas had never had experience in tax work and did not learn about personal holding companies until during the time when the petitioner's returns for the year ending October 31, 1946, were being audited by the Bureau some time in 1948. Thomas relied on Peyser and Musterer as to what tax returns had to be filed for the company. He relied on no one else. He signed whatever Peyser signed. Neither Peyser, Musterer or any one else for the firm of Simonoff, Peyser & Citrin, or any one else, ever advised him that the petitioner was a personal holding company prior to 1948, or that it had to file a special return. The income and declared value excess profits tax return, and the excess profits tax return, of petitioner for the year ending October 31, 1946, as filed with the collector bore Peyser's signature before Thomas signed them. When the firm of Simonoff, Peyser & Citrin was employed by the petitioner, Thomas spoke to Peyser who sent Musterer to petitioner's office where there was discussion about the formation of the petitioner corporation. Peyser was told that there were three partners, that they wanted to form a corporation to manufacture and develop metal and plastic toys, and to *197 send someone over to get the thing into motion. When Musterer came over Thomas spoke to him about doing the accounting work and the audit work. Musterer was told that they wished to form a corporation and take care of the matter as he had done for Thomas Manufacturing Company. Musterer was at petitioner's place about once or twice a month, with assistants. It was clear on petitioner's books that the income received was from royalties. The petitioner often received papers from Simonoff, Peyser & Citrin stating changes in the law but Thomas did not read them. He never inquired of the firm as to tax changes and never discussed taxes with Edwards. He followed the instructions of Simonoff, Peyser & Citrin. He never discussed taxes with Hohl or Shapiro. Simonoff, Peyser & Citrin did the bookkeeping for petitioner by auditing their records once a month. The petitioner's records used the word "royalty" in describing the income from people that were paying royalties to petitioner. The corporation income and declared value excess profits tax return of the petitioner for the year ending October 31, 1946, which was filed with the collector, stated in parenthesis "Income from Royalties," and later *198 under Item 11 stated the only income reported to be "Royalties $30,347.89." The answer to question No. 9 "Is the corporation a personal holding company within the meaning of Section 501 of the Internal Revenue Code?" is "No." It is signed by Thomas as president and Edwards as secretary and by Simonoff, Peyser & Citrin, by Michael Peyser as the person preparing the return. It was signed January 13, 1947, and filed on January 15, 1947. The firm of Simonoff, Peyser & Citrin consisted in 1946 and 1947 of eight partners. Peyser died in May 1950. The firm had approximately 60 employees, mostly staff accountants. It was established in 1913. All the partners and many of the employees are certified public accountants. The head of the tax department of the firm was one Steinberger. He is a member of the bar. All of the partners are members of the New York State Society of Certified Public Accountants, as are many of the certified accountants employed by the firm. All partners are members of the American Institute of Accountants, as are most of the certified accountants employed. The partners and many of the certified accountants hold Treasury cards. Four members of the *199 firm were authorized to practice before The Tax Court of the United States. Citrin was the only one who tried cases before the Tax Court. All senior accountants were admitted to practice before the Treasury. There were about ten senior accountants. Peyser at the time of his death was a director of the New York State Society of Certified Public Accountants. The firm does general auditing, and with respect to practically all of their clients does their tax work, including rendering of reports and preparation of tax returns. It does work for some of the large banks of New York. It has been consulted by banks on questions of tax law or changes in the tax law. It is sometimes retained by or through the New York Credit Men's Association, generally involving tax work. The obligation of the firm in the retainer from the petitioner was the same as that in connection with other clients, that is, to do auditing and the preparation of all returns required, including the determination of what returns should be filled out and submitted, and the finished return is mailed to the client with instructions as to signature and mailing, amount of payment, etc. Though the firm has mimeographed form letters *200 outlining instructions, which it mails with its returns, it has no special mimeograph or other form for personal holding companies. The preparation of a return was generally assigned to an accountant familiar with the particular taxpayer and its affairs. After such preparation it was checked by a senior accountant or member of the firm. After typing and checking for mathematical accuracy it was finally reviewed by another and different senior accountant or a member of the firm. After complete assembly it was placed upon the desk of the particular partner who was responsible for that particular client or taxpayer. He examined the return and signed the certificate thereon. Such procedure was followed in the case of the petitioner. Peyser was the partner who had the last say in signing petitioner's return. The firm endeavors to keep its clients advised as to important tax changes and has sent out to its clients various printed or multigraphed brochures and letters in that connection over a period of years. A notice of this kind sent out in 1938 referred to personal holding company law. The firm also handles the matter of revenue agents' examination of every client's books and records. *201 It is represented on such occasions and submits additional data or proof required by the agent; also protests. It is also represented in conferences with the Conference Section of the revenue agent's office, and has handled numerous matters before the Technical Staff. It has prepared approximately 50 claims for refund under section 722 of the Interal Revenue Code. For the year 1947 the firm maintained a book record of tax returns filed for its clients. It contained a sheet for each month and showed the name of the client and the types and dates of returns expected to be filed for the particular client. The tax department of the firm followed that sheet as a custom so that the returns are filed, or mailed, to the clients in time for filing. The book contains all the tax returns filed during 1947. Returns for the petitioner were due January 15, 1947. The sheet shows the filing for the petitioner of a Form 1120 and Form 1121 on January 11, 1947. The book shows that the firm sent to the petitioner no Form 1120H, which is the personal holding company tax return, required to be filed by a personal holding company in addition to Form 1120. The firm on February 3, 1947, filed a Form 1120H *202 for a certain client, and did the same for another client on September 11, 1947. The book shows all returns filed during the year 1947 and only two personal holding company returns were filed. Prior to October 31, 1946, the matter of personal holding companies had been discussed by Steinberger and Citrin. Peyser had attended meetings of the New York State Society where personal holding company law was discussed. The firm had a meeting of its staff on Saturday of each week, except during the summer, for the discussion of new tax laws and changes in tax laws, accounting questions, and accounting problems. After the enactment of the personal holding company law some such meetings were devoted to the question of personal holding companies. In the latter part of 1948 Steinberger was called in upon the matter of the examination of the petitioner's return for the year ending October 31, 1946, after Musterer had met with the field agent who had brought up the question of personal holding company. Steinberger, Musterer and Peyser had a meeting, looked at the tax return and decided there was no question but that the company was a personal holding company. Peyser's reaction was that he could *203 not understand how he overlooked it other than his impression that the company was going to manufacture plastic toys. He had been under that impression throughout the time the company was active. Peyser could not understand how he came to sign the return which indicated on the face thereof that petitioner was a personal holding company, except the fact that he was ill at the time. Peyser went into the hospital in February 1947 for a series of three operations over a period of about three years which finally resulted in his death in May 1950 from cancer. For about five months before his first operation he was in and out of the office depending upon how he felt. He suffered a great deal of pain. The petitioner's tax return was actually prepared by one Ilson, who was the accountant who worked on petitioner's books. It was checked by Musterer, typed and sent to Peyser. Musterer was a senior accountant. He did not make the audit of petitioner's books in order to get up the income tax return; that was assigned to a semi-senior accountant. It was the duty of the semi-senior accountant who prepared the return to ascertain whether the questions on page 3 of the return (including the question *204 as to whether the company was a personal holding company) were answered correctly. It was the duty of the senior accountant to check the answers to those questions. That responsibility was also upon the senior accountant or partner who put his name on the return; so that there were in effect three checks. Nevertheless, no personal holding company tax return was filed for petitioner. The book which was maintained by the firm as a record of tax returns for clients contained the names of clients inserted by the chief typist or secretary, from records submitted to her by the tax department. She typed in the names of the clients in advance. From then on it was followed up by the tax department. In 1947 Steinberger was responsible for setting up in the book as to what returns should be filed. It was part of his job to examine the situation to find out whether or not a personal holding company return should be filed. No advice was ever sought from him as to the tax consequences of the operation of the petitioner corporation. There was never any discussion with him as to the type of tax return to be filed for the petitioner, and no discussion with him about filing an excess profits tax *205 return. The answer "No" to question No. 9 (whether petitioner was a personal holding company) was filled out by Ilson who prepared the return originally. The answer was a mistake and Ilson should have known otherwise. The excuse of Musterer, the senior accountant who looked the return over before Peyser did, was that at the time the company was organized it was going to be a manufacturing company and he never had any idea that it would turn out to be a personal holding company whose sole income would be royalties. He did not know in advance that income would be royalties and he was careless when he saw the figures on the returns. The firm on one other occasion overlooked the filing of a necessary return. This was due to the fact that it was a state return which could be filed a month later than a Federal return and an extension had been secured to file the Federal return so that the firm failed to ask for an extension as to the state return. The petitioner's failure to file a personal holding company return was due to reasonable cause and was not due to wilful neglect. Opinion We have set forth the facts in our findings in considerable detail and we think they need not be referred *206 to at any great length here. The petitioner relied upon a firm of accountants, including persons particularly attending to tax matters. This firm had been employed in earlier years by two of the three stockholders of the petitioner corporation and had been found to be satisfactory. Petitioner retained the firm to look after its accounting and tax matters in general and in particular to prepare for filing any necessary returns. Though the petitioner was in fact a personal holding company within the statute, and though the income and declared value excess profits tax return prepared by the firm showed on its face that petitioner's only income was royalties, the firm by plain and admitted oversight failed to prepare and submit to the petitioner's office the return required of a personal holding company. It now appears to be well settled that under section 291 of the Internal Revenue Code failure to file a return is due to reasonable cause and not to wilful neglect if the petitioner discloses to competent tax advisers all of the pertinent facts and relies, even though mistakenly, upon the advice given by such advisers. Reliance Factoring Corp., 15 T.C. 604. *207 The matter is one of fact, of course, in each case. That the petitioner did so rely upon tax advisers can not be doubted under the record before us; and the petitioner appears to have been altogether justified in so relying. The firm consisted of a number of certified public accountants, all admitted to practice before the Treasury Department of the United States, and some of them before this Court. They had some 60 employees, many if not most of whom were certified public accountants and authorized to practice before the Treasury Department. Despite the almost inexplicable error of the firm in failing to prepare for the petitioner's filing a return as a personal holding company, although the income and declared value excess profits tax return twice shows on its face that petitioner's income was from royalties, and the firm was in charge of the petitioner's books and records and making monthly audits, nevertheless the firm was one upon which the petitioner could, in the exercise of ordinary prudence and business care, rely to prepare the necessary return. The respondent does not question that all pertinent facts were by the petitioner disclosed to the accounting firm; for he requests *208 findings that Thomas, petitioner's president, called Peyser, a partner in the accounting firm, and informed him that a new corporation was to be formed from three former partners; also a finding that the stockholders were the three, plus Edwards, making less than five stockholders; and the respondent further requests findings that Musterer, the senior accountant sent by the firm to see Thomas, knew of the type of income received by the petitioner, that is, royalties, and that the papers audited by Musterer once a month so showed. This is consistent with the evidence that Musterer was informed of the fact of less than five stockholders; and the income and declared value excess profits tax return shows that the firm was fully informed that all income was royalties. Thus, it appears that all pertinent facts were disclosed to a firm which the petitioner and its officers supposed to be and accepted as competent to handle the petitioner's tax affairs, including advice as to the proper filings. Under all the evidence, particularly with reference to the system of precautions against error followed by the firm and the fact that the system had failed only one other time, we conclude that the *209 firm selected was competent to advise on tax matters. The respondent suggests also that the petitioner's officers were educated, capable, intelligent men capable of receiving knowledge on the subject of income tax returns to be filed. We think the point is not helpful here. Thomas and Hohl were engineers and Shapiro was a capable business man. But considering the complexity of taxes, we think the experience of such men is not such as to indicate that they are not using common prudence in consulting specialists in taxation. Edwards, though an attorney, specifically disclaimed any qualification on tax matters, and certainly merely because he was an attorney in general practice does not suggest that his associates were not reasonable in seeking accounting and tax counsel. Under such circumstances, we can not doubt that the petitioner has shown that the failure to file the necessary return is due to reasonable cause. There appears to be no contention that it was due to wilful neglect. After review of the authorities cited by the parties, we have concluded that the doctrine of respondeat superior does not apply in this matter of the tax penalties here involved. The point which the respondent *210 stresses and calls focal in this case is that Steinberger, the head of the tax department of the firm, was never personally informed by the petitioner of the pertinent facts, that is, the facts as to number of stockholders and that all income was from royalties, though it was Steinberger's responsibility to decide which of the firm's clients should file personal holding company returns. In effect, the respondent would charge the petitioner with the obligation, when dealing with a large firm of accountants, to place all the pertinent information before any one of them who might decide whether a personal holding company return should be filed or not. We cannot believe that the exercise of ordinary business care and prudence requires so much of the petitioner; on the contrary we think that when the petitioner placed its tax affairs in the hands of the firm it reasonably can not be expected to inquire into the inter-relation of the partners in handling such tax matters. We conclude and hold that the petitioner has shown that it exercised reasonable cause under section 291 (a) of the Internal Revenue Code for its failure to file a personal holding company return; *211 from which it follows that we hold further that the imposition of the 25 per cent penalty is disapproved. Decision will be entered under Rule 50.