## RAGSDALE v. PASCHAL et al.

### No. 2333.

United States District Court,
E. D. Arkansas, W. D.

Jan. 5, 1954.

J. G. Williamson, Little Rock, Ark., for plaintiff.

H. Brian Holland, Asst. Atty. Gen., Andrew H. Sharpe and Harry E. McDermott, Jr., Assts. to the Atty. Gen., and James T. Gooch, U. S. Atty., Little Rock, Ark., for defendants.

TRIMBLE, Chief Judge.

For many years prior to 1944 the plaintiff Fred E. Ragsdale, was engaged in business in Camden, Arkansas. He was the sole proprietor of Dixie Specialty Company, hereinafter called Dixie, the nature of this business being the sale of electrical specialties, household and other appliances, and the operation of coin machines. These machines were placed in different business locations over the town and country-side, and consisted of vending, amusement and gambling machines. In the month of December, 1944, plaintiff sold the coin machines and has not operated such machines since. About that time he began the erection of the Dixie Tourist Courts, at Camden, Arkansas, which he complet-

ed in June of 1945. He has owned and operated the courts since their completion.

The tourist courts cost the plaintiff $87,100.51, which amount he paid in full upon their completion. This sum was paid from moneys from the following sources: From the purchase money received on sale of coin machines, loans and withdrawals from Dixie, $37,981.51 and, the remainder, $49,119, he paid by withdrawals from his safety deposit box. It is his contention that the money in the safety deposit box represented savings accumulated from his earnings over a period of thirty years, 1914 to 1944 inclusive. (Tr. pp. 465-6)

Because of the large amount of money which plaintiff expended upon the erection of the tourist courts, and his failure to file a timely return for 1944 (Tr. p. 614), the agents of the defendants made a special investigation into plaintiff's income tax return for 1944. The Commissioner refused to accept plaintiff's books and records as accurately reflecting his income for 1944, and attempted to reconstruct plaintiff's income for that year by the increase in net worth method. Based upon his computations the Commissioner determined that plaintiff had fraudulently failed to report additional coin machine collections in 1944 in the amount of $28,124.16 (Tr. pp. 622, 650, 651). The Commissioner also determined that plaintiff without reasonable cause and due to wilful neglect had failed to file a timely return for 1944. In making his computation the Commissioner did not credit the plaintiff with $2,197.12 previously paid as tax, interest and penalty for 1944. Based upon these determinations the Commissioner assessed against the plaintiff an income tax deficiency for that year in the amount of $15,905.23, a fraud penalty of $7,952.62, a delinquency penalty of $3,-976.31, and interest of $6,982.26. This made a total deficiency assessment of $34,816.42, which the plaintiff paid. Plaintiff brought this action to collect the entire amount of the deficiency assessment which he had paid and in addition thereto seeks to recover $986.07, which he alleged he overpaid as tax, penalty and interest for the year of 1944.

Since 1935 the plaintiff has kept a set of double entry books, with appropriate and sufficient supporting journals, cash books and records (Tr. p. 697). These books have been audited each year by agents of the commissioner, except 1937, and have been accepted as being adequate and correctly kept, and as reflecting the income of the plaintiff, with some minor corrections or adjustments.

From their own testimony and all of the evidence in the case it is clear that the agents who made the investigation in this case spent a very considerable part of two years in checking and auditing plaintiff's books and records, and other sources of information. However, one source of information they did not investigate was asking the taxpayer as to the amount of cash he had on hand on December 31, 1936, or asking the plaintiff and his bookkeeper about the living expenses of the plaintiff during the years 1936-1944 inclusive. (Tr. p. 655). They have not pointed out with any definiteness whatsoever any substantial errors in plaintiff's records, nor with any degree of certainty any source of income which the plaintiff might have had during the year 1944, other than the income shown by his books and reflected by his income tax return. In fact the agent admitted very frankly that he had found no evidence either from plaintiff's books or any outside source specific items of unreported income for 1944. (Tr. 620, 622, 651, 652). He also said that he assumed there were unreported collections from the coin machines because "It was the only known source of income sufficient to produce such an increase." (Tr. p. 622).

Inasmuch as the defendants rely upon there being unreported income from coin machine collections during the year 1944, it is necessary to state in some detail the method of that operation, which was carried on through the medium of the Dixie Specialty Company.

There are two distinct phases of business done by Dixie. One phase was the sale of electrical specialties and appliances. This phase of the business is not of great moment here, as there is no evidence or claim of any unreported income under this phase, and a discussion of the method of doing business would throw no light upon the issues. It is sufficient to say that it appears regular in all things, and in fact no issue is raised as to the accuracy of this phase of the business.

The other phase of Dixie's business was the operation of coin machines of different kinds. These machines were placed in locations convenient to the public, such business places being owned or operated by third persons. The collections from these machines during 1944 were made by either one of two employees of Dixie. When a coin machine collection was made, the proceeds from the collection were counted by Dixie's employee with the proprietor of the location, or an employee. The proprietor of the location would receive from 25% to 50% of the proceeds, depending upon the type of machine and the location. The employee of Dixie making the collection would prepare a collection receipt in triplicate, which showed the date, the location, the total collection, the amount received by the proprietor of the location, and the amount received by Dixie. This receipt in triplicate was signed by the proprietor of the location or his employee, and by the employee of Dixie, and one copy was given to the proprietor of the location, two copies being retained by Dixie.

At the end of the collection trip the collection books, containing the retained copies of each individual collection ticket, and the cash collections were turned over to the bookkeeper. The collections shown in these books were totaled by the bookkeeper, checked against the cash receipts, and each individual collection receipt entered in the day book, and the daily totals were then entered in the journal. The monthly totals of these collections were entered by the bookkeeper in the general ledger. From this source was obtained the total of the coin machine collections for 1944. This total was verified from the general ledger by the certified public accountant who prepared plaintiff's income tax return for 1944. The coin machine collections for 1944 were substantiated by plaintiff's record books and by the original receipt on each individual collection. These collection receipts were preserved by the taxpayer, were delivered to agents of defendant for checking and were introduced in evidence. No error was found other than a difference of some $124, one or two collection receipts not having been entered on the books.

In arriving at the increase of net worth figure which the Commissioner used in making his assessments, the agents of the Commissioner took the balance sheet of Dixie Specialty Company for December 31, 1936, as adjusted by revenue agents at that time, and treated it as reflecting plaintiff's net worth as of that date. In doing so the agent was clearly in error. It is stipulated by the parties that at that time the plaintiff had on deposit $2,500 in a postal savings account, a war bond for $1,000, and a savings account in a Little Rock bank which on that date showed a balance of $5,085.63. The bookkeeper for the plaintiff has testified, and her evidence stands unimpeached, that in making up the balance sheet for Dixie as of December 31, 1936, she did not take these sums into account, and in fact she knew nothing of their existence. The plaintiff himself testified to other funds he had in his possession at that time accumulated during his military service of five years and after his release in 1919, and during the succeeding years, as savings from his earnings. This evidence also stands unimpeached, either by direct evidence or circumstances. The agent on cross-examination frankly stated that if his assumption that this balance sheet of Dixie as of December 31, 1936, reflected the net worth of Fred E. Ragsdale was in error, that error followed throughout the whole computation and

the whole computation was in error. (Tr. pp. 611, 645).

■ Section 41 of the Internal Revenue Code, 53 Stat. 24, Title 26 U.S.C.A. § 41, provides in part as follows:

"The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. * * *"

Therefore if the method of accounting used by the plaintiff was a commonly accepted method and the books were sufficiently accurate and complete for the computation of income for the year 1944, then there would be no justification for the Commissioner attempting to reconstruct plaintiff's net income for that year through any alleged increase in net worth, or by any other method than from the books and records. This would be so unless there should be found income from some source which the plaintiff had received and which had not been taken into the books. The source of this income and the amount must be ascertainable with at least reasonable definiteness.

■ The defendants have failed to point out any substantial errors in the books and records kept by plaintiff, have failed to point out with any degree of certainty any source from which he received income in 1944 not recorded on his books, and have failed to meet the burden of proving with reasonable clarity the amount of that income. The agents have stated several possibilities or assumptions, but neither possibilities nor assumptions can take the place of evidence, and those relied on here do not meet the requirements of the law.

■ There was no justification for resorting to the increased net worth method of accounting. The courts have sustained the Commissioner's use of this method of accounting only in cases where the taxpayer has kept no records or very inadequate or inaccurate records, or where fraudulent failure to report known items or sources of income are apparent.

Plaintiff in his brief cites the case of Thomas A. Talley, 20 T.C. 715 (decided June 30, 1953). There the Tax Court refused to sustain the Commissioner's reconstruction of income based on the net worth method. Quoting from the opinion:

"Section 41 provides that 'net income shall be computed * * * in accordance with the method of accounting regularly employed in keeping the books of the taxpayer. The Commissioner's authority under section 41 to compute the income 'in accordance with such method as in the opinion of the Commissioner does clearly reflect the income' exists only if no method of accounting has been regularly employed in keeping the books of the taxpayer, or 'if the method employed does not clearly reflect the income.' See Regulations III, sections 29, 41–1 and 29, 41–2. The evidence clearly establishes that neither of those qualifying conditions existed here and we do not believe respondent seriously contends otherwise. An accurate computation of income for all years in question could have been made from the books of account.

"In the circumstances, we do not think respondent had authority to determine income for the years in question by the increase in net worth method. Section 41 of the Code; * * *"

In the case of Bechelli v. Hofferbert, 111 F.Supp. 631, 633, the District Court held:

"The testimony of the witnesses satisfied me that the bookkeeping

was honestly and fairly done and that the figures entered in the books for gross income and expenses were substantially correct. The critical test as to the sufficiency of the books on their face is whether they are sufficient to calculate the net income. If they are sufficient in this respect then the simpler the books the better. * * * The question in each case must be determined on its particular facts in view of the nature, volume and complexity of the business. * * * If the figures are correct the books are sufficient to show the net income. Of course the books on their face are not conclusive of the proper figures and their inaccuracy, whether by inadvertence or fraud, can be shown by other evidence. In this case there is no such other evidence; nor is there any evidence even of reasonable suspicion as to the fairness and accuracy of the books as kept."

See the case of James Q. Whittemore, 7 TCM 845 (1948). In this case the Tax Court refused to accept the Commissioner's method of determining taxpayer's income, and there said:

"The main reason we are reluctant to accept respondent's method of determining income is the fact, as we have already stated, that he can point to no known source of income on the part of petitioner other than that which flowed from the Clyde business, and we are satisfied that the income from that venture was reported with substantial correctness. But there is another reason of equal importance that throws discredit on respondent's method and that is his failure to determine with any degree of accuracy petitioner's net worth at the starting date of December 31, 1941. *It would be absolutely necessary to know the amount of petitioner's net worth at the beginning of the taxable period before one could determine under a net worth basis a tax-payer's income for succeeding years* [emphasis supplied].

* * * * * *

"The use of a method such as employed by respondent where there are no books and records, or where there is evidence that there has been some tampering with the books and records, or where a taxpayer is engaged in activities other than his regular business, may well be justified. But on the facts here produced, we think the respondent was not warranted in disregarding the petitioner's books and records and employing the method he did employ in the determination of the deficiencies covering the years before us."

The evidence is clear and convincing that the books and records of the plaintiff for the year 1944 are adequate, correctly, honestly and fairly kept, and that they reflect plaintiff's income for the year 1944. It appearing from the evidence that the net worth of the plaintiff on December 31, 1943, as fixed by the Commissioner, is in error, being based on erroneous computations of prior years, it follows that the computation of the plaintiff's net income for the year 1944, by the method used by the Commissioner, is in error.

The court finds that the plaintiff did not understate the amount of his income for the year 1944, and that the Commissioner was in error in refusing to accept plaintiff's books and records.

█ It follows, of course, that the plaintiff not having understated his income, he could not be and was not guilty of fraud, and the imposition of a fraud penalty in this case is not justified.

█ The failure of the plaintiff to file an income tax return for the year 1944, was not due to wilfull neglect, but was due to a reasonable cause. Since 1935 the income tax returns for the plaintiff had been prepared by W. T. Reynolds, a certified public accountant. It was the custom of Mr. Reynolds to obtain from the bookkeeper a trial bal-

ance sheet, spot check the accuracy of the trial balance against the books of Dixie, prepare plaintiff's tax return, have plaintiff execute the return, secure from the plaintiff his check to cover the tax shown to be due, and mail or deliver the return to the Collector in Little Rock, Arkansas. (Tr. 10–11, 348). This same general procedure was followed in 1944 (Tr. 11, 347–349). Sometime prior to April 9, 1945, Reynolds prepared plaintiff's income tax return for 1944 and Declaration of Estimated Tax for 1945. The 1944 income tax return as originally prepared disclosed an income tax liability of $2,007.07, the payment of $2,-222.28 on 1944 Declaration of Estimated Tax.

The plaintiff executed both the income tax return for 1944 and Declaration of Estimated Tax for 1945 and returned them to W. T. Reynolds for filing, together with plaintiff's check dated April 9, 1945, in the amount of $196.20 to cover installment on 1945 income tax then due. The issuance of this check is evidenced both by the check stubs and the books of Dixie. The plaintiff assumed that the returns had been filed by W. T. Reynolds, and knew nothing otherwise, until Revenue Agent Estes during the course of his examination in 1949 informed him and his bookkeeper that the return had not been filed. When informed by the agent that no return had been filed, Reynolds checked his files and there found plaintiff's original executed income tax return for 1944 and Declaration of Estimated Tax for 1945. Reynolds in 1945, having some question in his own mind about the number of payments that had been made on the 1944 estimated tax, called the Collector's office, verified that only three payments had been made, and made the correction with a pencil on the original returns which he gave to his secretary to retype. Through some mistake in office procedure the return was not corrected and returned to plaintiff for re-execution, but was placed in the files of Reynolds. This fact escaped the attention of Reynolds, who was preparing income tax returns for many concerns at that time, and Reynolds thought no more of it until his attention was called to it in 1949 by the agent. Reynolds does not know what became of the check for $196.20 which he obtained from plaintiff to pay the tax due on the Declaration of Estimated Tax for 1945. The fact that this check was still outstanding was called to the attention of Reynolds by the bookkeeper, and Reynolds advised her he would attend to it, and finally near the end of 1945 Reynolds told the bookkeeper to drop this check from her outstanding checks and he would investigate it when in Little Rock, and that if it had not cleared by the time the 1945 return was filed in March of 1946 they would simply not include this check in the total of plaintiff's payments on the 1945 Declaration of Estimated Tax (Tr. 351). Plaintiff was not informed of this situation and never had any knowledge that the check was outstanding or had not cleared until informed during the Agent's investigation in 1949 or 1950. (Tr. 21–22, 355, 475–476) As soon as Reynolds found the return in his files he gave the original to the agent for his use in connection with the audit, prepared a copy of the original return for 1944, corrected only as to amount of payments, and filed it with the collector in April 15, 1950, with check to cover amounts called for.

Under the uncontradicted and unimpeached evidence in this case, the taxpayer himself, was not even at fault in the failure to file this return for 1944. It is true that the duty devolved upon him to file the return, but following the usual, and ordinary course of such matters, he took action which ordinarily would have resulted in the return being properly filed. There was no intention on his part not to file the return, and the fact that it was not filed was wholly unintentional on his part. Aside from that he had nothing to gain by not filing it as he had already filed a Declaration of Estimated Tax and paid the tax for 1944. This falls far short of being "wilful neglect".

■ Section 291(a) of the Code provides for a penalty of 25% of the tax for failure to file a timely return "unless it is shown that such failure is due to reasonable cause and not due to willful neglect".

In the case of Southeastern Finance Company v. Commissioner, 5 Cir., 153 F.2d 205, the court said:

"Reasonable cause means nothing more than the exercise of ordinary business care and prudence."

See also P. Dougherty Co. v. Commissioner, 4 Cir., 159 F.2d 269, 273. In re Fisk's Estate, 6 Cir., 203 F.2d 358, 359 states:

"Reasonable cause means nothing more than the exercise of ordinary business care and prudence. Haywood Lumber & Mining Co. v. Commissioner, supra [2 Cir., 178 F.2d 769]; Orient Investment & Finance Co. Inc., v. Commissioner, 83 U.S. App.D.C. 74, 166 F.2d 601, 3 A.L.R. 2d 612; Southeastern Finance Company v. Commissioner, 5 Cir., 153 F.2d 205. Various courts have held as a matter of law that reliance upon an attorney or an accountant for making out and filing of tax returns constitutes reasonable care. Dayton Bronze Bearing Co. v. Gilligan, 6 Cir., 281 F. 709; Haywood Lumber & Mining Co. v. Commissioner, supra; Orient Investment & Finance Co. Inc. v. Commissioner, supra. The tax court has repeatedly decided that reliance upon counsel constitutes reasonable cause for failure to timely file necessary tax returns. The C. R. Lindback Foundation Inv. v. Commissioner, 4 T.C. 652; Brooklyn & Richmond Ferry Co., Inc. v. Commissioner, 9 T.C. 865; Safety Tube Corporation v. Commissioner, 8 T.C. 757; Diana McFadden Houk, 6 T.C.Memo. 649."

As pointed out by the Second Circuit in Haywood Lumber & Mining Co., supra, 178 F.2d at 771:

"To impute to the taxpayer the mistakes of his consultant would be to penalize him for consulting an expert; for if he must take the benefit of his counsel's or accountant's advice *cum onere*, then he must be held to a standard of care which is not his own and one which, in most cases, would be far higher than that exacted of a layman."

In re Fisk's Estate, 203 F.2d 358, 360, states:

"We adhere to the rule stated in Haywood Lumber & Mining Co., supra, that as a matter of law reasonable cause was shown in this case. This rule, we hold, applies to the filing of tax returns as well as to reliance upon technical advice in complicated legal matters. We think this conclusion is in accord with the principle declared by the Supreme Court that the penalties under the revenue laws were designed to be imposed upon conduct 'which is intentional, or knowing, or voluntary, as distinguished from accidental.' United States v. Murdock, 290 U.S. 389, 394, 54 S.Ct. 223, 225, 78 L.Ed. 381. 'It is not the purpose of the law to penalize * * * innocent errors made despite the exercise of reasonable care.' Spies v. United States, 317 U.S. 492 [494], 496, 63 S.Ct. 364, 367, 87 L.Ed. 418." Bouvelt Realty Inc., 46 B.T.A. 45; Plastic Parts Development Corporation, 10 T.C.M. 584; Reliance Factoring Corporation, 15 T.C. 604.

■■ But defendants make the contention that there is a presumption that the findings of the Commissioner on a disputed question of fact are correct. Granting there is such a presumption, it is not an absolute one, but is rebuttable. When any evidence is introduced in rebuttal of such a presumption the presumption disappears and the burden is upon the plaintiff to establish his right to recover by a preponderance of the evidence. There is evidence introduced, ample to overcome this presumption.

■ Furthermore the burden of proving fraud is upon the defendants. 26

U.S.C.A. § 1112, 53 Stat. 160; Greenfeld v. Commissioner, 4 Cir., 165 F.2d 318. A mere preponderance of the evidence is not sufficient to meet this burden of proof. Rather, the Commissioner must prove fraud by clear and convincing proof. Duffin v. Lucas, 6 Cir., 55 F.2d 786. See also United States v. DeMartini, D.C., 53 F.Supp. 162, 163, where the court said:

> "To establish fraud the evidence must be clear and convincing, more so than in the ordinary civil case. (Citing cases.)"

See also, Rogers v. Commissioner, 6 Cir., 111 F.2d 987, 989: "Fraud cannot be lightly inferred, but must be established by clear and convincing proof."

 This burden the defendants have not met.

The findings of fact are in the opinion with the following additional findings:

## I

Plaintiff overstated his income for 1944 by the amount of $2754.78, determined by certain adjustments which should be made to plaintiff's reported net income for that year:

(a) Plaintiff's income tax return for 1944, originally prepared in 1945 and filed in 1950, disclosed a net income for 1944 of $8,369.90.

(b) Plaintiff's return overstated plaintiff's income from the Star and Tux recreation parlors in the amount of $1,840.

(c) Plaintiff's return understated plaintiff's allowable deduction for depreciation by the amount of $3,210.11.

(d) Plaintiff's return erroneously reported a $300 profit from the sale of a Buick automobile as ordinary income rather than as a long term capital gain.

(e) Plaintiff's return erroneously claimed as a deductible business expense the sum of $1,150 contributed to the Arkansas Governor's race.

(f) Plaintiff's return erroneously claimed a deduction of $178 as charitable contributions in addition to claiming the standard optional deduction of $500.

(g) Plaintiff's return failed to include long term capital gains of $1,039.13 reflected on the books of Dixie Specialty Company.

(h) Plaintiff's return failed to include $228.20 of coin machine collections reflected by the original coin machine receipts.

(i) The sum of these adjustments is as follows:

| Net income reported in 1944 | | $8,369.90 |
| | Deduct | Add |
|---|---|---|
| (b) | $1840.00 | |
| (c) | 3210.11 | |
| (d) | 300.00 | |
| (e) | | $1150.00 |
| (f) | | 178.00 |
| (g) | | 1039.13 |
| (h) | | 228.20 |
| (i) Total | $5350.11 | $2595.33 |
| Balance | | $2,754.78 |

Plaintiff's correct income for 1944 was therefore $5,615.12.

### Conclusions of Law

1. Plaintiff did not understate his income for 1944 by any amount.

2. The Commissioner was not justified in disregarding plaintiff's books and records and resorting to an increase in net worth method of accounting.

3. Plaintiff was not guilty of fraud, and the Commissioner was in error in assessing a fraud penalty against the plaintiff.

4. Plaintiff overstated his income for 1944 in the amount of $2,754.78.

5. Plaintiff owed a 5% delinquency penalty of $57.67 for failure to file a timely return up to April 9, 1945, a period less than 30 days.

6. After April 9, 1945, plaintiff's failure to file a timely return for 1944 was due to reasonable cause and was not due to wilful neglect.

7. The Commissioner erred in assessing a delinquency penalty of $4,061.40

against plaintiff for 1944, rather than a delinquency penalty of $57.67.

8. Plaintiff is entitled to judgment against the defendant Roy G. Paschal, in the sum of $455.66, against the defendant William D. Self, in the sum of $530.41 and against the defendant Olin S. Godwin, in the sum of $34,816.42, together with interest according to law, and court costs.

A decree in accordance with the opinion, findings of fact and conclusions of law will be entered. Counsel for plaintiff will prepare such a decree and present it to the court for entry.