DENALI DENTAL SERVICES, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Denali Dental Services v. Commissioner
Docket Nos. 12145-81; 12146-81; 12149-81; 16996-83; 16997-83
United States Tax Court
T.C. Memo 1989-482; 1989 Tax Ct. Memo LEXIS 482; 58 T.C.M. (CCH) 13; T.C.M. (RIA) 89482; September 5, 1989
Jean S. Schanen, for the petitioners. Henry T. Schafer and Larry N. Johnson, for the respondent. FAY
MEMORANDUM OPINION FAY, Judge: These *485 consolidated cases were assigned to Special Trial Judge Daniel J. Dinan pursuant to section 7456(d) (redesignated as section 7443A(b) by the Tax Reform Act of 1986, Pub. L. 99-514, section 1556, 100 Stat. 2755) of the Code and Rule 180 et seq. [2] For convenience and clarity, the Findings of Fact and Conclusions of Law have been combined in this opinion. The Court agrees with and adopts the opinion of the Special Trial Judge which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE DINAN, Special Trial Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax under section 6653(b) as follows: Additions to Tax
Petitioner
Docket No.
Year
Deficiency
Sec. 6653(b)
Denali Dental
12145-81
1978
$  74,708
$ 37,354
Services
1979
128,527
64,264
Ronald I. and
12146-81
1977
5,342
2,671
Florence S. Glaeser
1978
143,453
71,727
16997-83
1979
79,020
39,510
Ronald I. Glaeser,
12149-81
1978
50,636
25,318
D.D.S., Inc.
Aldfrey Company
16996-83
1979
3,516
--
*486 In answers and amended answers in docket Nos. 12145-81, 12146-81, 12149-81 and 16997-83, respondent alleges, in the alternative, that any underpayments of tax not due to fraud are due to negligence. Accordingly, respondent asserts that petitioners Denali Dental Services, Ronald I. Glaeser and Florence S. Glaeser, and Ronald I. Glaeser D.D.S., Inc. are liable for additions to tax under section 6653(a), with respect to the years at issue in those cases. By amended answers in docket Nos. 12146-81 and 12149-81, respondent alleges and claims revised total deficiencies and additions to tax as follows: Additions to Tax
Petitioner
Docket No.
Year
Deficiency
Sec. 6653(b)
Ronald I. and
Florence S. Glaeser
12146-81
1978
$ 110,197
$ 55,099
Ronald I. Glaeser
D.D.S., Inc.
12149-81
1978
82,327
41,164
Numerous issues raised in the pleadings and amended pleadings have been conceded by the parties. The issues remaining for decision are as follows: (1) whether Denali Dental Services (Denali) [3] is a sham entity; (2) alternatively, if not a sham entity, whether income of Denali is taxable to Ronald I. Glaeser and Florence S. Glaeser *487 (the Glaesers), pursuant to the grantor trust provisions of sections 671 through 679; (3) whether Denali is an association taxable as a corporation; (4) whether Ronald I. Glaeser D.D.S., Inc. (the Corporation) realized income from accounts receivable when it transferred all of its assets to Denali; (5) whether the Glaesers received a constructive dividend when assets were transferred by the Corporation to Denali; (6) whether the Glaesers may deduct amounts paid to American Tax Education Society (ATES) and others as tax planning fees; (7) whether interest income, dividend income, rental income, and rental expenses properly should have been reported on the Glaesers' individual income tax returns, instead of on Aldfrey Company's fiduciary income tax returns; (8) whether the Glaesers are entitled to deduct travel and entertainment expenses; (9) whether the Glaesers failed to report taxable income from capital gains in taxable year 1979; (10) whether Diatrics Company (Diatrics) was an "investment company" (11) whether petitioners Denali Dental Services, Ronald I. Glaeser and Florence S. Glaeser, and Ronald I. Glaeser D.D.S., Inc. are liable for additions to tax under section *488 6653(b) for fraud; and (12) alternatively, if not liable for fraud, whether petitioners Denali Dental Services, Ronald I. Glaeser and Florence S. Glaeser, and Ronald I. Glaeser D.D.S., Inc. are liable for additions to tax under section 6653(a) for negligence. Some of the facts have been stipulated and are so found. The stipulations of fact, combined stipulations of fact, supplemental combined stipulations of fact, and attached exhibits are incorporated herein by this reference. Petitioners Ronald I. Glaeser and Florence S. Glaeser, husband and wife, resided in Anchorage, Alaska, at the time they filed their petitions. The Glaesers filed joint Federal individual income tax returns (Form 1040) for the tax years 1977, 1978 and 1979. Dr. Glaeser practiced full time as a dentist; Mrs. Glaeser worked part time as a bookkeeper. Petitioner Denali Dental Services (Denali) originally purported to be a "common law business trust organization," [4] created in the State of Alaska on or about January 1, 1978. *489 Denali filed fiduciary income tax returns (Form 1041) for the tax years 1978 and 1979. Petitioner Ronald I. Glaeser D.D.S., Inc. (the Corporation) was incorporated in the State of Alaska on July 7, 1975. The Corporation filed a corporation income tax return (Form 1120) for its fiscal year ended June 30, 1978. Petitioner Aldfrey Company (Aldfrey) originally purported to be a "business trust organization," created in the State of Alaska on or about March 1, 1978. Aldfrey filed a fiduciary income tax return (Form 1041) for the tax year ended December 31, 1979. Charles H. Bumpus and Glen A. Huff were business associates who lived in Anchorage, *490 Alaska. In 1976, they met Hiram Conley, a representative of the American Law Association (ALA) who informed them that they could reduce their income and estate tax liability through the use of foreign trust organizations (FTOs). He told them that the use of FTOs to reduce income and estate tax liabilities had been researched by Karl Dahlstrom (Dahlstrom) and that Dahlstrom conducted seminars on the subject for members of the ALA. Mr. Bumpus and Mr. Huff joined ALA and attended a seminar given by Dahlstrom in Alaska. At that seminar, Dahlstrom explained the plan to reduce taxes through the use of FTOs. They also received a "tax package" consisting of, inter alia, excerpts from Federal and state tax cases and various tax commentaries. In 1976, Mr. Bumpus and Mr. Huff created a business trust organization called the American Tax Education Society (ATES) and became its co-trustees. ATES was used by Mr. Bumpus and Mr. Huff to market "tax package materials" and to provide those who purchased the tax package materials with advice and assistance relating to business trust organizations. Mr. Bumpus and Mr. Huff, as co-trustees of ATES established an office and hired Wesley J. Milton, *491 an accountant, to assist purchasers of the ATES tax package with any problems they might encounter after their purchases. On December 8, 1977, the Glaesers paid $ 11,500 to ATES. The payment entitled them to (1) membership in ATES and in ALA, (2) transportation from Alaska to Houston, Texas, for Dr. Glaeser to attend Dahlstrom's tax seminar, (3) transportation for Dr. Glaeser from Houston, Texas, to Belize, Central America, (4) assistance from ATES in establishing and maintaining business trust organizations and tax counseling from ATES officials, (5) the ATES tax package and forms pertaining to the establishment of business trusts and (6) transportation for Dr. Glaeser to return to Alaska from Belize. At his seminars in Houston, Texas, Dahlstrom lectured those who attended on how to create foreign and domestic trust organizations in order to reduce their tax liabilities. In December, 1977, Dr. Glaeser attended a two-day, Dahlstrom Seminar in Houston, Texas. Dr. Glaeser was convinced that Dahlstrom had discovered the ultimate legal tax loophole through his research. He was impressed by Dahlstrom's presentations and believed that FTOs were a legitimate means of reducing his *492 income tax liabilities. Dr. Glaeser thereafter, in December, 1977, journeyed to Belize, Central America, with Messrs. Bumpus, Huff and Milton, in order to establish his FTOs. Dr. Glaeser established three such trusts: Bimler Trust Company (Bimler) as his number one trust, Calvarium Consulting (Calvarium) as his number two trust, and Laminadura Enterprises (Laminadura) as his number three trust. Bimler was established as a trustee company, Calvarium was established to receive payments from Denali and Aldfrey for consulting and management services, and Laminadura was established to act as an advisory trustee to Calvarium. Belizian law required that the trust "creator" be a resident of Belize. ATES arranged for one Lascelle Tillett (Tillett) to serve as creator of Dr. Glaeser's trusts. Tillett then appointed Dr. Glaeser as trustee for Bimler. Bimler was then appointed sole trustee for both Calvarium and Laminadura. Under the terms of the trust documents, Tillett had no rights and responsibilities, except to insure that the terms of the trust were carried out by the trustee. As trustee (directly for Bimler and indirectly for Calvarium and Laminadura), Dr. Glaeser had complete *493 dominion and control over the trusts and was authorized in his sole discretion to distribute trust income to anyone, including himself. Upon returning to Anchorage from Belize, Dr. Glaeser then set up two domestic trusts: Denali Dental Services and Aldfrey Company. On or about January 1, 1978, all of the assets of Dr. Glaeser's dental practice were transferred from the Corporation to Denali. The dental office was housed in a building owned by Geneva Woods Dental Center, a partnership. Dr. Glaeser's partnership interest in the dental center was also transferred to Denali. The trust creator for Denali was an ATES member, Lee R. Ellenburg. Dr. Glaeser and Mrs. Glaeser were named as trustess. On or about March 1, 1978, rental property owned by the Glaesers in Alyeska, Alaska, and a brokerage account owned by Dr. Glaeser were transferred to Aldfrey to establish it as an investment company. The trust creator for Aldfrey was another ATES member, Cynthia Lee Worledge. Again, Dr. Glaeser and Mrs. Glaeser were named as trustees. In Anchorage, the Glaesers opened a bank account for each of the trusts, both foreign and domestic, except for Bimler. [5]
*494 Once established, petitioners used their domestic and foreign trusts to effect a circular routing of monies, most of which were eventually "gifted" back to petitioners. Dr. Glaeser had conducted and managed his own dental practice since 1965. He incorporated his practice in 1975 and was paid a salary by the Corporation. With the creation of Denali on January 1, 1978, the Corporation allegedly conducted no further business. However, the Corporation continued to exist until September 30, 1980, when it was involuntarily dissolved by the State of Alaska. Denali collected most of the Corporation's accounts receivable after January 1, 1978, although some of the amounts receivable were collected by the corporation after that date. The amounts collected by Denali were deposited in its bank account and reported as income on its Federal income tax returns. As of January 1, 1978, Dr. Glaeser conducted his business as a sole proprietorship instead of a professional corporation. Patients were then billed by the proprietorship and income received was deposited in the proprietorship's bank account. This income was then reported on Schedule C of the Glaesers' joint individual tax return. *495 Pursuant to a January 1, 1978, contract between Dr. Glaeser and Denali, Denali was to assume all nonprofessional management responsibilities for the dental practice, including paying employees, purchasing supplies, and providing office space, equipment, furniture, laboratory services and office maintenance for Dr. Glaeser's dental practice. Pursuant to the contract, Dr. Glaeser's proprietorship made payments to Denali for these services. All payments were made by check based upon invoices prepared by Dr. Glaeser. These payments to Denali were deducted by Dr. Glaeser on Schedule C of his joint individual return. On June 1, 1978, Denali appointed Calvarium to act as "advisory trustee." Denali was to pay Calvarium $ 79,000 as an annual retainer and additional compensation based upon an "as used" basis. On June 10, 1979, the annual retainer was increased to $ 128,000. In 1978, Denali paid Calvarium $ 79,000 for its alleged "consulting" services; in 1979, Denali paid Calvarium $ 103,000 for alleged "consulting" services. On June 5, 1978, Calvarium arranged to have Laminadura act as its "advisory trustee," with fees determined on an "as utilized" basis. In 1978 and 1979, Calvarium *496 paid Laminadura "advisory trustee fees" in the amounts of $ 78,000 and $ 111,000, respectively. Laminadura, in turn, loaned monies to Aldfrey or Charles Connel (a dentist friend of Dr. Glaeser) and received promissory notes from both Aldfrey and Charles Connel. Laminadura then gifted those notes to the Glaesers who then collected the monies due on the notes. The Glaesers stopped the circular loan-note-gift transactions in 1980 upon the advice of ATES's attorney, Jean Schanen. The Glaesers have acknowledged the impropriety of the circular gifting transactions and they concede the deficiencies in income tax for the years in issue arising from receipt of the gifted note proceeds. On December 17, 1979, Diatrics Company (Diatrics) was created as a domestic business trust organization. Dr. Glaeser was named Executive Trustee. Diatrics' creator was Cynthia Lee, a member of ATES. On December 17, 1979, Laminadura "invested" $ 500,000 in Diatrics in the form of a promissory note and received in exchange therefor 100 Trust Certificate Units (TCU's) of Diatrics, In December 1979, Laminadura paid Diatrics $ 61,000 in partial satisfaction of the promissory note. Denali Dental *497 Services . The first issue for decision is whether Denali is a sham entity. Respondent contends that Denali is a sham because it had no economic substance apart from tax avoidance. Alternatively, respondent contends that if Denali is recognized as a valid trust, its income should be attributed to petitioners under the grantor trust provisions of sections 671-679. Petitioners assert that Denali had a valid business purpose and that Denali was substituting for Dr. Glaeser's professional corporation in a reorganization transaction. We agree with respondent that Denali is a sham entity. It is well-settled that a taxpayer has the legal right to minimize his taxes or altogether avoid them by any means which the law permits. Gregory v. Helvering, 293 U.S. 465, 469 (1935). However, where a transaction has no economic substance, other than tax avoidance, we need not recognize it for Federal income tax purposes. Frank Lyon Co. v. United States, 435 U.S. 561 (1978); Knetsch v. United States, 364 U.S. 361 (1960). When the form of a transaction *498 has not, in fact, altered any cognizable economic relationships, we will look through that form and apply the tax law according to the substance of the transaction. Zmuda v. Commissioner, 79 T.C. 714, 720 (1982), affd. 731 F.2d 1417 (9th Cir. 1984); Markosian v. Commissioner, 73 T.C. 1235, 1241, 1244-1245 (1980); Furman v. Commissioner, 45 T.C. 360, 366 (1966), affd. per curiam 381 F.2d 22 (5th Cir. 1967). This rule applies regardless of whether the entity, such as a business trust organization, has a separate existence recognized under State law and whether, in form, it is a trust, a common law business trust, or some other form of jural entity. [6]Zmuda v. Commissioner, supra at 720; Furman v. Commissioner, supra at 364. The structuring of Denali enabled Dr. Glaeser, as executive trustee of Denali to "contract" with himself to provide "management services" to himself. Dr. Glaeser, however, received no compensation *499 for the management services he provided as executive trustee of Denali, despite the fact that he had previously performed these same services as an employee of the corporation, for which he was paid a salary. The creation of Denali provided Dr. Glaeser with an entity useful to him in the implementation of the Dahlstrom circular "loan-note-gift" transactions. The "management services contract" between Dr. Glaeser and Denali provided Dr. Glaeser with a convenient vehicle by which he could infuse money into the circular flow of funds which were ultimately "gifted" back to him. Petitioners have conceded the impropriety of the circular "loan-note-gift" transactions. We fail to find any economic substance in a trust established as an integral part of a plan to effect the "loan-note-gift" transactions which petitioners have conceded were improper. Accordingly, we find that Denali is a sham entity for Federal income tax purposes. The Glaesers concede that they are liable for the deficiencies in tax determined by respondent for the years in issue resulting from their implementation of the ALA/Dahlstrom "loan-note-gift" transactions. Denali, Bimler, Calvarium, Laminadura and Aldfrey *500 were paper concoctions of the Glaesers' designed to implement the ALA/Dahlstrom scheme to avoid Federal taxes. Our reading of this record compels us to conclude that Denali, Bimler, Calvarium, Laminadura and Aldfrey were paper "houses of cards" formed by petitioners to implement the ALA/Dahlstrom plan to avoid Federal taxes. The above-mentioned foreign and domestic trusts were integral parts of an overall tax avoidance scheme having no economic substance and we so find. Having determined that Denali was a sham entity, we need not address ourselves to the question of whether the grantor trust provisions of sections 671-679 apply, nor need we decide whether Denali was an association taxable as a corporation. Since we have found that Denali is a sham entity, the transactions between Denali and others, including the Glaesers, are treated as having never occurred. On Schedules C of their 1978 and 1979 Federal income tax returns, the Glaesers deducted as costs of goods sold, $ 109,110 and $ 186,900, respectively, allegedly paid to Denali for management services. Since we have found Denali to have been a sham entity, respondent's disallowance of these deductions claimed by the Glaesers *501 is sustained. The Corporation
As we have noted, supra, the Corporation, a cash basis taxpayer, on January 1, 1978, transferred all of its assets to Denali. Included in those assets were accounts receivable in the amount of $ 193,577 and depreciable assets in the amount of $ 15,501. The Corporation, however, continued its existence until September 30, 1980, when it was involuntarily dissolved by the State of Alaska. Subsequent to January 1, 1978, the Corporation continued to collect its accounts receivable in the amount of $ 18,743 which it reported on its Federal corporate income tax return for the fiscal year ended June 30, 1978. Respondent initially claimed that the transfer of $ 193,577 in accounts receivable to Denali represented an anticipatory assignment of income by the Corporation, and is therefore taxable to the Corporation even though the Corporation did not receive the payments. [7] See Lucas v. Earl, 281 U.S. 111 (1930); Helvering v. Horst, 311 U.S. 112 (1940); Floyd v. Scofield, 193 F.2d 594 (5th Cir. 1952). Respondent now claims that the Glaesers are liable in 1978 for tax on $ 174,834 ($ 193,577 *502 - $ 18,743), the amount of the accounts receivable. Respondent further claims that the Glaesers are liable in 1978 or 1979 for tax on $ 15,501 worth of dental equipment. Petitioners argue that the transfer of assets from the corporation to Denali qualifies as a tax-free reorganization. We disagree with petitioners. We reject out-of-hand petitioners' afterthought that the alleged transfer of assets by the corporation to Denali was a tax-free reorganization. We have previously found that Denali was a sham. Thus, any transactions involving Denali must be set aside. Accordingly, we must put the pieces of this puzzle back together. Our resolution of these issues will be given effect in the parties' Rule 155 computations, which will include the following: (a) The transfer of accounts receivable from the Corporation to Denali on January 1, 1978, was an anticipatory assignment of income by the Corporation to Denali. The income from the accounts receivable, therefore, is income *503 to the Corporation. Lucas v. Earl, supra; Helvering v. Horst, supra; Floyd v. Scofield, supra.
(b) The income from the accounts receivable and the fair market value of the depreciated property which was also transferred from the Corporation to Denali constituted a constructive dividend to the Glaesers and were taxable to them. Clark v. Commissioner , 31 B.T.A. 1082 (1935), affd. 84 F.2d 725 (3d Cir. 1936), involved a corporate transfer of property to trusts created by a controlling stockholder for the benefit of his children. As to the issue of whether this transfer should be treated as a distribution to the controlling stockholder, the Court stated, (supra at 1084-1085): The petitioner controlled the Willoughby Company. It acted solely to accomodate him in making the transfer. He enjoyed the use of the property by having it transferred for his own purposes. This was the use he wanted to make of the property. He would have enjoyed it no more had it been distributed to him directly. * * * See also Edgar v. Commissioner, 56 T.C. 717, 758, (1971); *504 Johnson v. Commissioner, 74 T.C. 1316 (1980). (c) Respondent argues that various expenses claimed by Denali should either be "collapsed" into the Corporation's or the Glaesers' tax returns. Since we have found that Denali was a sham entity, it follows that the expenses incurred by Dr. Glaeser in his dental practice in 1978 and 1979, and the income earned by him in his dental practice in those years are attributable to him. Tax Planning Fees
On their 1977 tax return (Form 1040), the Glaesers claimed a deduction of $ 11,870 for tax advice, pursuant to section 212. The Glaesers paid $ 370 to attorney Trigg T. Davis to set up a "Clifford" trust for the benefit of the Glaeser children. They also paid $ 11,500 to ATES which amount included: membership for the Glaesers in ATES and ALA; travel expenses for Dr. Glaeser to the Dahlstrom seminar in Houston; travel expenses for Dr. Glaeser to Belize; assistance and counseling from ATES officials concerning the establishment and maintenance of "business trust organizations"; preprinted forms and tax materials; and return expenses to Alaska. *505 Section 212(1) allows a deduction for expenses paid for the production or collection of income. Section 212(2) allows a deduction for expenses paid for the management, conservation, or maintenance of property held for the production of income. Finally, section 212(3) allows a deduction for amounts paid in connection with the determination, collection, or refund of any tax. Petitioners have the burden of proof as to this issue. Rule 142(a). Petitioners have totally failed to show that the above amounts were paid to ATES or Davis for the production of income or maintenance of property or for the determination or collection of any tax. See Zmuda v. Commissioner, supra at 724-725. Accordingly, we deny the deduction in its entirety. Aldfrey Company Income and Expenses
We have previously found that Aldfrey was a sham entity. It was established by the Glaesers as a domestic trust to be used in the ALA/Dahlstrom tax avoidance plan and otherwise had no economic substance. Accordingly, Aldfrey's transactions shall be ignored for Federal income tax purposes. We must then determine to whom Aldfrey's income and expenses shall be attributed. On March 1, 1978, the *506 Glaesers allegedly transferred a brokerage account to Aldfrey. [8] During 1978 and 1979, the account earned interest income of $ 491 and $ 688, respectively, and dividend income of $ 544 and $ 854, respectively. Aldfrey reported these amounts as income on its 1978 and 1979 tax returns. In March 1978, the Glaesers also transferred their Alyeska rental property to Aldfrey. The property consisted of a cabin with two apartments of approximately equal size. The lower apartment was rented to tenants while the Glaesers reserved the upper apartment for their personal use. During 1978 and 1979, Aldfrey reported rental income of $ 3,800 and $ 1,933, respectively. Also during 1978 and 1979, Aldfrey deducted 100 percent of the expenses related to the cabin in the amounts of $ 12,022 and $ 12,176, respectively. Because we have found that Aldfrey is a sham, it is not recognized for Federal tax purposes. Transactions between the Glaesers and Aldfrey will be disregarded and treated as if they *507 never occurred. Accordingly, the interest and dividend income reported by Aldfrey is properly attributable to the Glaesers in 1978 and 1979. Also, all the income from the Alyeska rental property is taxable to the Glaesers in 1978 and 1979. On its Federal income tax returns for 1978 and 1979, Aldfrey deducted expenses related to the Alyeska cabin in the amounts of $ 12,022 and $ 12,167, respectively. We have calculated that the Glaesers are entitled to deduct on their 1978 and 1979 returns as rental expenses the amounts of $ 5,942 and $ 5,735, respectively. The Glaesers are also entitled to claim as itemized deductions on their 1978 and 1979 returns, interest and taxes in the amounts of $ 3,104 and $ 3,134, respectively. The remainder of the cabin expenses claimed by Aldfrey on its 1978 and 1979 returns are nondeductible personal expenses of the Glaesers As we decided with regard to Denali, any "advisory trustee fees" deducted by Aldfrey are altogether disallowed, as they were part of the circular "loan-note-gift" transactions. Travel and Entertainment Expenses
The Glaesers deducted $ 2,472 as travel and entertainment expenses on Schedule C of their 1979 tax return. *508 Respondent has disallowed the claimed expenses. An income tax deduction is a matter of legislative grace, and the burden of clearly establishing the right to a claimed deduction is on the taxpayer. New Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934); Rule 142(a). The Glaesers have failed to carry their burden of proof. Accordingly, we find that the claimed expenses are not deductible. Capital Gains
The Glaesers owned a partnership interest in Charrington Development (Charrington) and "sold" this interest to Aldfrey in April 1979. As Aldfrey was a sham, the partnership interest is attributable to the Glaesers at all times. In 1979, real property owned by Charrington was involuntarily converted and the recognition of the resulting capital gain was deferred for three years pursuant to section 1033. Replacement property was to be purchased within the requisite period after the conversion as replacement for the converted property. No replacement property was purchased by the December 31, 1982 deadline. Accordingly, the Glaesers were required to report *509 on their 1979 tax return their share of the partnership capital gain. The Glaesers did not report this capital gain on their original or amended 1979 tax returns. It is clear from the record that the Glaesers agree with respondent's determination that a capital gain adjustment is appropriate in this case. However, it is unclear as to just how much that determination is. After considering the section 1202 deduction, respondent appears to be determining an unreported capital gain of $ 1,928 for 1979. [9] We find for respondent on this issue as to $ 1,928. Diatrics. We have noted, supra, that Diatrics was established in December 1979, as a domestic business trust and that Dr. Glaeser was named as Executive Trustee of the trust. Diatrics allegedly was funded by a $ 500,000 promissory note issued to it by Laminadura. In December 1979, Laminadura also allegedly paid Diatrics $ 61,000 in partial satisfaction of the promissory note. Petitioners, in their brief, request us to find that "Diatrics Company is also *510 an investment company. It was formed by Laminadura Enterprises." (Requested Finding of Fact #4.) In his brief, respondent objected to petitioners' Requested Finding of Fact Number 4 on various stated grounds. In their briefs, none of the parties informed us of their legal positions as to the treatment to be afforded to the alleged payment of $ 61,000 by Laminadura to Diatrics in 1979. In an attempt to fill the void in this record, we have, regrettably, had to search the record to find as follows: Diatrics was established as a domestic business trust on December 17, 1979. Its creator was Cynthia Lee, a member of ATES. On that same date, Diatrics exchanged $ 10.00 and 100 of its trust certificate units for the real and/or personal property of Laminadura, as investor, which, in turn, conveyed $ 10.00 and 100 of its trust certificate units to Diatrics. The personal property allegedly conveyed to Diatrics by Laminadura was a promissory note in the amount of $ 500,000. The above-mentioned agreement was signed by Cynthia Lee, as creator of the Diatrics business trust organization and by the investor, "Laminadura Enterprises, By: Bimler Trust Company, Trustee, By: Ronald I. Glaeser, *511 Trustee." There is no evidence in this record that Diatrics ever invested any money in anything. None of the parties introduced into evidence any facts which would show what Diatrics did after it was established in December 1979. We can only conclude that Diatrics was but another sham entity established by Dr. Glaeser through Cynthia Lee, a member of ATES, to siphon money from the FTOs by the Glaesers to personally benefit them. Accordingly, we will also disregard Diatrics for Federal tax purposes because it, too, was a sham used by the Glaesers to implement the ALA/Dahlstrom plan to reduce taxes. Laminadura is not entitled to a deduction for the $ 61,000 allegedly paid to Diatrics in 1979. Fraud
We must decide whether petitioners, Denali Dental Services, Ronald I. and Florence S. Glaeser, and Ronald I. Glaeser D.D.S., Inc., are liable for additions to tax under section 6653(b) for fraud. Because we have found that Denali is a sham and we are disregarding all transactions involving it, there is no underpayment in tax to which the fraud addition could apply. Section 6653(b) *512 provides that if any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. The Commissioner has the burden of proving, by clear and convincing evidence, that some part of the underpayment for each year was due to fraud. Section 7454(a); Rule 142(b); Levinson v. United States, 496 F.2d 651, 654-655 (3d Cir. 1974), cert. denied 419 U.S. 1040 (1974); Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). The Commissioner will carry his burden if he shows that the taxpayer intended to evade taxes which he knew or believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States, 398 F.2d 1002, 1004-1005 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Webb v. Commissioner, 394 F.2d 366, 377-378 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Acker v. Commissioner, 26 T.C. 107, 111-112 (1956). *513 The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner, supra at 199. Fraud is never presumed, but rather must be established by affirmative evidence. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Circumstantial evidence is permitted where direct evidence of fraud is not available. Spies v. United States, 317 U.S. 492, 499 (1943); Powell v. Granquist, 252 F.2d 56, 61 (9th Cir. 1958); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983); Gajewski v. Commissioner, supra at 200. Fraud may properly be inferred where an entire course of conduct establishes the necessary intent. Rowlee v. Commissioner, supra at 1123; Stone v. Commissioner, 56 T.C. 213, 223-224 (1971). The precise amount of underpayment resulting from fraud need not be proved. Otsuki v. Commissioner, 53 T.C. 96, 105 (1969). The statute requires only a showing that "any part" of an underpayment *514 results from fraud. However, the Commissioner must show fraud resulting in an underpayment for each taxable year in which fraud has been determined. Otsuki v. Commissioner, supra.
Respondent's evidence shows that L. William Childs, a certified public accountant, prepared Dr. Glaeser's personal and corporate income tax returns beginning in 1976. On February 7, 1978, Dr. Glaeser advised him that, as of January 1, 1978, he would operate his orthodontic practice as a sole proprietor. Dr. Glaeser also informed Mr. Childs that he was establishing an entity to be known as Denali Business Services which would handle the administrative functions of his practice, i.e., paying bills, preparing payroll, preparing billings, etc. Mr. Childs asked Dr. Glaeser to provide him with information about changing from a corporation to a sole proprietorship, the transfer of corporate assets and the role that Denali Business Services would play in the operation of his orthodontic business, in accordance with the information given him by his advisors who recommended the plan. Dr. Glaeser informed Mr. Childs that he was receiving tax advice from ATES and asked him to contact representatives *515 of ATES for any information he required. Mr. Childs contacted Wesley Milton, who provided him with the information so requested. Mr. Childs concluded his testimony by noting that he had never learned anything about Dr. Glaeser in his dealings with him that would cause him to distrust Dr. Glaeser in any way. Respondent also introduced into evidence the testimony of Trigg Davis, an attorney in Anchorage, Alaska, who prepared a Clifford Trust for Dr. Glaeser to provide for the education of Dr. Glaeser's children. Mr. Davis' contact with Dr. Glaeser was through an attorney who worked in the trust department of a local bank in Anchorage. He did nothing for Dr. Glaeser other than to establish the aforementioned Clifford Trust. Respondent then introduced into evidence the testimony of Revenue Agents Brown, Kinney and Bernard who, at various times, were assigned to audit the various returns in issue. The substance of Revenue Agents Brown's and Bernard's testimony was that they received from Dr. Glaeser the records they requested to conduct their audits. The substance of Revenue Agent Kinney's testimony was that, at the time of trial, he did not remember what records he had received *516 from Dr. Glaeser. He did testify, however, that he was assigned to audit petitioners' 1977 return and the only item he was examining was the deductibility of the $ 11,500 paid to ATES. In this case, respondent has failed to prove by clear and convincing evidence that some part of the underpayment of tax for each year was due to fraud. Respondent has failed to show that petitioners intended to evade taxes by conduct designed to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States, supra at 1004; Gajewski v. Commissioner, supra at 200; Beaver v. Commissioner, supra at 92-93; Acker v. Commissioner, supra at 111-112. As we consider the facts in this record bearing on respondent's determination of fraud, we keep in mind that a taxpayer's attempt to avoid paying taxes does not necessarily establish fraud. Professional Services v. Commissioner, 79 T.C. 888, 930 (1982). It is well settled that a taxpayer is entitled to arrange his affairs so as *517 to minimize his tax liability by any means which the law permits. Gregory v. Helvering, supra at 469; Professional Services v. Commissioner, supra at 930. The Supreme Court has stated that "it is not the purpose of the law to penalize frank difference of opinion or innocent errors made despite the exercise of reasonable care." Spies v. United States, supra at 496. If the law is clear and well established, the taxpayer will not be permitted to simply ignore applicable principles of income tax law. However, where the inclusion of income is doubtful, its exclusion is not evidence of fraud. Duffin v. Lucas, 55 F.2d 786, 799 (6th Cir. 1932); Danenberg v. Commissioner, 73 T.C. 370, 393-394 (1979); Mayock v. Commissioner, 32 T.C. 966, 974 (1959). Proof of fraud here must include evidence that petitioners knew that they owed tax on the income ostensibly belonging to the FTOs. Petitioners were clearly misled when they involved themselves in the use of the complicated ALA/Dahlstrom business trust program; of that, we have no doubt. Dr. Glaeser, admittedly a well-educated *518 man, had no substantial training or experience in bookkeeping, accounting, or tax law before attending the Dahlstrom seminar. Although he was familiar with the rudiments of tax law, he lacked the knowledge to determine whether the use of FTOs, as advocated by ALA/Dahlstrom Plan, was legal or not. See Danenberg v. Commissioner, supra at 393-394. The use of FTOs seemed to the Glaesers to be a legitimate method of reducing taxes. When the Glaesers began using the FTOs to reduce their tax liability, the trusts seemed to be similar to corporations -- legal fictions with substantial tax benefits. The Glaesers did not distinguish the theoretical tax law differences between the legitimate use of a corporation to reduce taxes and the illegitimate use of FTOs to accomplish the same purpose. In both instances, petitioners signed legal documents, and kept meticulous records detailing transactions among Dr. Glaeser, his corporation, and his trusts. Respondent has presented no evidence that would convince us that Dr. Glaeser knew that the FTOs were not a valid means of reducing their taxes. We do not understand respondent to argue that the Glaesers failed to maintain *519 adequate books and records to document each and every step taken by them to implement the ALA/Dahlstrom plan. To the contrary, respondent acknowledges on brief that "petitioners went to elaborate lengths to document these transactions." In Professional Services v. Commissioner, supra, taxpayers participated in the ALA/Dahlstrom plan involved in these consolidated cases. In 1976, the taxpayers in Professional Services paid $ 47,400 for a tax package and deducted that amount on their joint Federal income tax return for 1976. The Court found that, pursuant to a plan prearranged by Mr. Bumpus and Mr. Huff, the taxpayers paid nothing for the tax package allegedly purchased in 1976. On their 1977 joint return, the taxpayers in Professional Services deducted $ 64,000 allegedly paid to Professional Services for equipment, clinic and supplies, management and other services, which were necessary in the conduct of their dental practice. Pursuant to the ALA/Dahlstrom circular flow of funds plan, the $ 64,000 was redeposited to the taxpayers' personal account. The taxpayers attempted to characterize the retransfer of the $ 64,000 to themselves as a loan. *520 Three sets of "promissory notes" were prepared to cover the same transaction. All of the notes were back dated to make it appear that they had been prepared simultaneously with the retransfer of the funds. The second and third sets of notes were prepared after the due dates had expired on at least some of the notes in the first set. The second and third sets of notes indicate that the taxpayers in Professional Services were assuming liability on the notes, while the first set indicates that the funds were given to them. The third set of notes was represented to respondent as the original and correctly dated notes representing the transactions as they occurred in 1977. Additionally, a Court order was required to compel the taxpayers in Professional Services to produce records requested by respondent. In Professional Services, the taxpayer represented the back dated notes as being the original indebtedness upon which the claimed deductions were based. We found such active attempts by the taxpayer, to make it appear that he was entitled to a deduction to which he knew he had no right, to be clear and convincing evidence of the taxpayer's fraudulent intent. We further *521 found an indication of the taxpayer's fraudulent intent in his failure to cooperate with the Commissioner by providing all of his books and records for examination. In the case at hand, no such clear and convincing evidence of fraudulent intent by petitioners exists. Upon a review of the record in this case, we conclude that the underpayments of tax for the years in issue resulted from petitioners' mistaken belief as to the legal consequences of the various transactions involved. Accordingly, respondent has failed to prove fraud and we hold for petitioners on this issue. See Melvin L. Cochran, D.D.S. Inc. v. Commissioner, T.C. Memo. 1989-102. Negligence
Since we have found that petitioners, the Glaesers and Ronald I. Glaeser, D.D.S., Inc. are not liable for fraud, we must now consider respondent's alternative argument, whether petitioners, the Glaesers and Ronald I. Glaeser D.D.S., Inc., are liable for additions to tax for negligence under section 6653(a). During the years in issue, *522 section 6653(a) provided as follows: (a) Negligence or Intentional Disregard of Rules and Regulations with Respect to Income or Gift Taxes. -- If any part of any underpayments (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. Respondent pleaded alternatively in his answer and amended answers that the Glaesers and Ronald I. Glaeser, D.D.S., Inc. are liable for additions to tax for negligence under section 6653(a). As this issue was not raised in the notices of deficiency, it constitutes new matter upon which respondent bears the burden of proof. Rule 142(a). However, unlike the issue of fraud where respondent's burden of proof must be clear and convincing evidence, respondent's burden of proof on this addition to tax may be met by a preponderance of the evidence. The Glaesers consulted with members of ALA and ATES *523 about the legality of the ALA/Dahlstrom plan. We believe a reasonable and prudent person would have sought the advice of disinterested counselors before embarking on such an enterprise. In addition, respondent has shown that the Glaesers failed to report on their 1979 personal tax return a capital gain from the Charrington Development partnership. The capital gain issue was discussed earlier in this opinion. We conclude that respondent has carried his burden of proof on negligence regarding petitioners and the corporation for the years in issue. Decisions will be entered under Rule 155. Footnotes
1. The following cases were consolidated herewith for trial, briefing and opinion: Ronald I. Glaeser and Florence S. Glaeser, docket Nos. 12146-81 and 16997-83; Ronald I. Glaeser D.D.S., Inc., docket No. 12149-81; and Aldfrey Company, docket No. 16996-83.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. While we may refer to this and other purported entities as trusts in this opinion, we do not mean to imply that they would be recognized as trusts for federal income tax purposes.↩
4. The use of the following words and derivatives in our findings of fact is for narrative convenience only, and follows from the form in which the various transactions were cast: "common law business trust organization," "business trust," "trust," "gift," "loan," "tax planning," "creator," "certificate holder," "income," "advisory trustee fees," "management services," and "trust certificate units." The use of these terms is not intended to indicate any legal conclusions concerning the actual substance or legal effect of the transactions.↩
5. Bimler Trust Company appears to have had no bank account in either Alaska or Belize.↩
6. It is therefore unnecessary to decide whether Denali or the other domestic business trust organizations would have been recognized under state law.↩
7. Respondent asserts that the Corporation collected and reported $ 18,743 of the $ 193,577 in accounts receivable. Accordingly, respondent now claims the Corporation is liable for tax on $ 174,834.↩
8. The Glaesers failed to notify the brokerage house of this transfer and the broker continued to carry the account in the names of Ronald J. Glaeser and Florence S. Glaeser as joint tenants.↩
9. In his notice of deficiency, respondent claimed the unreported capital gain to be $ 2,003. The $ 75 difference is deemed to be conceded by respondent.↩